Wendy L. WICKHAM, Private First
Class, U. S. Army, Petitioner,

v.

Alvin O. HALL, Colonel, U. S. Army, and
United States, Respondents.

No. 81–26.

U. S. Court of Military Appeals.

Dec. 14, 1981.

For Petitioner: *Captain Johnny W. Thomas* (argued); *James R. Gillespie, Esq.* (on brief); *Colonel Edward S. Adamkewicz, Jr., Major Joyce E. Plaut, Major Raymond C. Ruppert, Captain James A. McAtamney, Stewart J. Alexander, Esq.*

For Respondents: *Captain Kenneth H. Clevenger* (argued); *Colonel R. R. Boller, Major Douglas P. Franklin, Major Ted B. Borak* (on brief); *Major John T. Meixell, Major John T. Edwards.*

For Amicus Curiae on Behalf of Respondents: *Colonel James P. Porter, USAF, Captain Richard O. Ely, II, USAF; Commander T. C. Watson, Jr., JAGC, USN, Lieutenant William C. Martucci, JAGC, USNR.*

Opinion

COOK, Judge:

Petitioner seeks to prohibit her trial by special court-martial on a charge that she fraudulently procured her separation from the Army, in violation of Article 83(2), Uniform Code of Military Justice, 10 U.S.C. § 883(2). She alleges she was released from active duty for reason of pregnancy, and was duly issued a DD Form 214, titled Certificate of Release or Discharge from Active Duty. The Government asserts petitioner's representations of pregnancy were fraudulent; that the separation order directing her release has been revoked; and that she is amenable to trial by court-martial under the provisions of Article 3(b), UCMJ, 10 U.S.C. § 803(b). A government motion to dismiss the petition because it does not present a "case . . . appropriate for extraordinary relief" has been denied. *See* 11 M.J. 357 (C.M.A.1981).

I. FACTS

In late August 1980, petitioner submitted a urine specimen for a pregnancy test. Subsequently, she received a medical certificate indicating that she had been pregnant for about seven weeks. Thereupon, petitioner formally requested that she "be released from duty on 15 Oct. 80 by reason of pregnancy." On September 10, 1980, the Commander, Fort Sam Houston, Texas, approved the request for release. As petitioner had entered upon active duty in the Army on January 30, 1979, for a term of four years, the letter of approval directed that petitioner "be released from active duty and transferred to the Individual Ready Reserve to complete her military service obligation." On the same day as the approval, the command promulgated Orders 177–105, which reassigned petitioner to US Army Separation Transfer Point, Fort Sam Houston, Texas. It further provided that, on completion of processing, she was to be "relieved from active duty" and assigned, effective October 16, 1980, to United States

Army Reserve Control Group (Annual Training), with her "Military Selective Service Act obligation" to end on April 9, 1984. A subdivision of the Orders, captioned "Additional instructions," lists certain obligations of petitioner. Among them is the following:

> You are responsible for maintaining your military clothing for military purposes to include short active duty tours and inactive duty training until such time as you are discharged from your United States Army Reserve status.

Department of Defense Form (DD Form) 214 was issued to petitioner on October 15, 1980. Consistent with the Orders, it notes petitioner was transferred to "USAR CON Gp (Anl Tng) RCPAC St Louis MO 63132," and listed her "Reserve Oblig. Term. Date" as April 9, 1984. The form also noted petitioner's "Primary Specialty," her qualification with the M–16 rifle, her military education, excess creditable leave, and her "SGLI [Servicemen's Group Life Insurance] Coverage" in the amount of $20,000.00.

Information surfaced early in November suggesting that petitioner may have submitted, as her own, a urine sample obtained from a pregnant servicewoman whom she knew. Investigation by agents of the Army Criminal Investigations Division (CID) led to procurement of sworn statements verifying the reported information. A formal charge was then lodged against petitioner, alleging she had violated Article 83(2) of the Code. Fort Sam Houston also issued Orders 245–102 revoking Orders 177–105.

The parties disagree as to the character of the events that led to petitioner's return on January 12, 1981, to Fort Sam Houston, and her engagement in work at Headquarters Company, US Army Garrison, which petitioner's then civilian counsel described, in an affidavit before the Court, as "her daily on-base routine." Appellate government counsel maintain that petitioner "voluntarily" submitted to military control. The civilian attorney represents that he "advised" petitioner "to present herself physically to" the post only because he had been told by the Chief of the Criminal Law Branch that if petitioner failed to do so, "a 'pickup' order" would issue for her apprehension, and she might not be allowed "evenings and weekends at her private residence."

On the day of petitioner's return to Fort Sam Houston, she was served with a copy of the formal charge. Petitioner displayed "a good attitude," and her unit commander considered "[h]er work" and "personal conduct" to be "satisfactory." However, petitioner still regarded herself as "a civilian," and refused to accept "pay or any other benefits from the Army."

Petitioner's case came on for trial before a special court-martial on January 23, 1981. After arraignment but before plea, trial was continued to March 2 to enable petitioner to retain a different civilian lawyer. On February 23, petitioner, represented by a new civilian attorney and the detailed military defense counsel, filed her pleading in this Court. The next day, this Court issued an order to show cause to the Government and directed a stay of the court-martial proceedings. Two days later petitioner applied to the installation commander "for Permission to Return to Civilian Lifestyle," but the request was denied. A government exhibit characterizes her as "AWOL" since March 30, but petitioner argues that the Government knows her "whereabouts" and has given "no indication" that it has "in fact treated ... [her as] absent without authority according to ... [its] regulations."[1]

## II. PETITIONER'S AMENABILITY TO TRIAL BY COURT–MARTIAL

Article 3, UCMJ, 10 U.S.C. § 803, contains two subdivisions authorizing trial by court-martial of a person who has changed his

---

1. The Court denied a government motion to dissolve the stay of the court-martial proceedings. The application rested, in part, on a representation that petitioner's status is that of an unauthorized absentee. 11 M.J. 357 (C.M.A. 1981). *Cf. United States v. Schreck*, 10 M.J. 226 (C.M.A. 1981).

relationship to the military between the commission of an offense under the Uniform Code and the commencement of proceedings on a formal charge. Subdivision (a) provides, in pertinent part, that, notwithstanding the change of relationship, a person is not "relieved from amenability to trial by court-martial" if the offense is "punishable by confinement for five years or more" and is not "tri[able]" in the courts of the United States or of a State." Subdivision (b) provides that, if after discharge, a former service person is "charged with having fraudulently obtained his discharge," he remains "subject to trial by court-martial on that charge," which is a violation of Article 83(2).[2] The subdivision further provides that if the ex-service person is convicted of the charge of having fraudulently obtained his discharge, he then "is subject to trial by court-martial for all offenses . . . committed before the fraudulent discharge."

Several years after the Uniform Code became operative, the Supreme Court determined that Congress could not, under its constitutional authority to make rules for the government of the armed forces (U.S. Const. art. I, § 8, cl. 14), subject a service member who had been honorably discharged to trial by court-martial for a violation of military law committed before the discharge. *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955). The Supreme Court acknowledged, and did not tergiversate, *Kahn v. Anderson*, 255 U.S. 1, 41 S.Ct. 224, 65 L.Ed. 469 (1921), which upheld the exercise of court-martial jurisdiction over a dishonorably discharged soldier who was a prisoner serving a court-martial sentence. The Court reasoned that Congress could not extend its special military legislative authority to "civilian ex-soldiers who had severed all relationship with the military and its institutions." 350 U.S. at 14, 76 S.Ct. at 3 (footnote omitted). "[T]he primary business of" the military,

said the Court, is "to fight or be ready to fight wars." It perceived the trial of a military offender to be "merely incidental" to the "fighting function," (*id.* at 17, 76 S.Ct. at 5), and, therefore, considered it "impossible" that disruption of discipline or impairment of morale would result from a civilian court trial of an ex-serviceman who is "actually" a civilian. *Id.* at 22, 76 S.Ct. at 8.

This Court has faithfully followed the *Toth* decision, both with respect to the effect of an actual discharge from the service (*United States v. Gallagher*, 7 U.S.C.M.A. 506, 22 C.M.R. 296 (1957); *United States v. Dickenson*, 6 U.S.C.M.A. 438, 20 C.M.R. 154 (1955)), and in recognition of the constitutional authority of Congress to extend court-martial jurisdiction over a prisoner serving a court-martial sentence under an executed dishonorable discharge. *United States v. Nelson*, 14 U.S.C.M.A. 93, 33 C.M.R. 305 (1963).

With *Toth* as the linchpin of their argument, appellate defense counsel contend that, like Article 3(a), Article 3(b) is unconstitutional, because like Toth, the petitioner was "discharged" and became a "civilian" who could not be tried by court-martial. As his dissent indicates, Chief Judge Everett has been persuaded by the analogy to *Toth* to conclude that Article 3(b) is also unconstitutional, although he concedes that, if petitioner's separation was "void," she would be triable by court-martial. However, at least three circumstances relied upon by the Supreme Court in *Toth* to support its conclusion that Article 3(a) is unconstitutional are materially different from the facts in this case. I consider each separately.

In *Toth*, the ex-service member had severed all connection with the military, and, as the Supreme Court observed, "he had no relationship of any kind with" it. 350 U.S. at 13, 76 S.Ct. at 3. Here, if certain repre-

---

**2.** Article 83(2), Uniform Code of Military Justice, 10 U.S.C. § 883(2), reads as follows:

Any person who—

.    .    .    .    .

(2) procures his own separation from the armed forces by knowingly false representation or deliberate concealment as to his eligibility for that separation;

shall be punished as a court-martial may direct.

sentations in the government's pleadings are supported by evidence and are believed, they can support a finding by the trial court that petitioner voluntarily returned to and performed active duty until after her arraignment.

In *United States v. Wheeler*, 10 U.S.C. M.A. 646, 653, 28 C.M.R. 212, 219–20 (1959), Judge Latimer opined that *Toth* does not bar trial by court-martial of a service member who, after commission of an offense violative of the Uniform Code, is released from active duty and transferred to a reserve unit for completion of an obligated term of service under the Universal Military Training and Service Act, 10 U.S.C. § 651(a). The other two members of the Court as then constituted, Chief Judge Quinn and Judge Ferguson, deemed it unnecessary to consider the effect of the accused's reserve obligation. But, they concluded from the evidence that the accused had "voluntarily" returned to active duty and was, therefore, not like *Toth*.

Secondly, petitioner here has, as Toth did not, an obligated period of reserve service. The obligated service encompasses "active duty tours" as well as "inactive duty training until ... discharged from ... United States Army Reserve status." She has not been so discharged. Considering obligated reserve service of this kind, in *United States v. Brown*, 12 U.S.C.M.A. 693, 695, 31 C.M.R. 279, 281 (1962), Chief Judge Quinn concluded, as Judge Latimer had in *Wheeler*, that accused's separation from active duty did not relieve him from amenability to trial by court-martial for an offense of the kind specified in Article 3(a), committed before his separation. However, the majority of the Court in *Brown* affirmed the decision of the United States Navy Board of Review (now Court of Military Review), which held that, notwithstanding the reserve obligation, a sufficient basis for continued military jurisdiction over Brown was lacking.

*Wheeler* and *Brown* may merit reexamination. For purposes of this proceeding, I assume, but do not decide, that petitioner's return to active duty was not voluntary, and her obligation to perform reserve duty, even with tours of active duty, is insufficient connection with the military to make her, constitutionally, amenable to trial by court-martial under Article 3(b) of the Code. Those circumstances aside, I proceed to the third point of difference between *Toth* and petitioner's case.

The validity of the proceedings which released Toth from active duty to return to the civilian community was unchallenged in his case. Here, the Government charges that petitioner procured her separation by fraud. This difference impresses me as so crucial to petitioner's relationship to the military as to set her situation apart from Toth's. It also convinces me that Congress could, constitutionally, make her amenable to trial by court-martial for the offense charged.

In *Toth*, three members of the Supreme Court dissented. Mr. Justice Black's opinion for the majority discusses the major point of the dissent, as stated in Mr. Justice Reed's opinion. Mr. Justice Black's discussion reveals an implicit acknowledgement that the Court's holding in *Toth* did not apply to a person in this petitioner's position.

The dissenters in *Toth* referred to earlier statutes which subjected ex-service members and civilian contractors with the military to trial by court-martial for certain frauds committed before termination of their military relationships. They argued that judicial and administrative decisions had upheld the authority of Congress to provide for military trial for such frauds. Taking cognizance of the dissenters' argument, Mr. Justice Black pointed out that the "[l]ower courts" that had considered the matter had disagreed as to the constitutionality of the statutes as regards civilian contractors. Turning to the constitutionality of these statutes as to ex-service members, Mr. Justice Black cited, with approval, a statement in Colonel Winthrop's eminent work, Winthrop, *Military Law and Precedents* 107 (2d ed. Reprint 1920). The statement was that "this class of statutes, which in terms or inferentially subject persons

formerly in the army, but become *finally and legally separated* from it, to trial by court-martial, are all necessarily and alike unconstitutional." 350 U.S. 14–15 n. 8, 76 S.Ct. 3–4 (emphasis added).

Analysis of the " 'class of statutes' " considered by the "[l]ower courts," to which Mr. Justice Black referred and Colonel Winthrop's statement alluded, discloses that they dealt with fraudulent acts independent of the process or proceeding by which the service members had been released from military control.

Colonel Winthrop's statement, which was unreservedly approved by Mr. Justice Black, implicitly recognized that not every separation from the service barred court-martial for a fraud offense. To have that effect, the separation had to be *final* and *legal*. Colonel Winthrop explained the meaning of this qualification earlier in his text. Persons separated from the military, he said, "cease to be military and become *civil persons* " only if the separation is accomplished by "the recognized legal modes of separation." Winthrop, *supra* at 89. Then, to foreclose any possibility of misconstruction of his meaning, Colonel Winthrop declared in a footnote: "The discharge must of course be due and legal, not fraudulent." *Id.* n. 46.

A long and unbroken line of civilian and military rulings confirms Winthrop's declaration.[3] I unqualifiedly agree with it now, as this Court did in *United States v. Scott*, 11 U.S.C.M.A. 646, 648, 29 C.M.R. 462, 464 (1960), where it said that military jurisdiction over the person "ends with the delivery to him of a *valid* discharge certificate." (Emphasis added.)

■ Separation procured by fraudulent means is not a valid separation. The fraud is not expunged by the issuance of a writing certifying the separation; rather the fraud taints the writing. The taint inheres in the act and the document—at least until it is affirmatively forgiven or recourse to it is barred by expiration of the prescribed period of limitations, as Article 3(b) recognizes. The service member may merge with the civilian populace, but the fraudulent character of his separation exists and it binds him to the military community.

■ Congress' power to subject a person to trial by court-martial, under its constitutional authority "[t]o make Rules for the Government" of the armed forces,[4] depends upon whether military jurisdiction exists over both the person and the act. The Supreme Court has enumerated extensive guidelines for inquiry into the military connection or significance of an act committed by a service member in the civilian community which is violative of both the military and civilian penal code. *See Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). The military courts have regularly utilized those guidelines. *See United States v. Trottier*, 9 M.J. 337 (C.M.A.1980); *United States v. Moore*, 1 M.J. 448 (C.M.A.1976). The Supreme Court has also determined that certain connections between a civilian and the military are too insubstantial to allow Congress to authorize trial by court-martial for a violation of the rules prescribed for the government of the military.[5] The Court, however, has not propounded specific guidelines for de-

---

**3.** Illustrative are: 28 *Op.Atty.Gen.* 170, 171 (1910); 16 *Op.Atty.Gen.* 349 (1879): 26 *Comp. Dec.* 712 (1920). *See United States ex rel. Roberson v. Keating*, 121 F.Supp. 477, 479 (N.D.Ill.1949); *Ex parte Drainer*, 65 F.Supp. 410 (N.D.Cal.1946), *aff'd.*, 158 F.2d 981 (9th Cir. 1947); *United States v. Redmond*, 23 C.M.R. 803 (A.F.B.R.1956); *United States v. Santiago*, 1 C.M.R. 365 (A.B.R.1951) and cases cited.

**4.** U.S.Const. art. I, § 8, cl. 14.

**5.** *See Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (civilian dependent of a member of an armed force resident on a military installation in a foreign country and having authority to use military services, such as the commissary and medical facilities; held insufficient to permit trial by court-martial, as provided by Article 2(11), UCMJ, 10 U.S.C. § 802(11)). *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960) (civilian employee accompanying an armed force to a foreign country; held insufficient to subject him to court-martial jurisdiction, as provided by Article 2(10), UCMJ, 10 U.S.C. § 802(10)).

termination of jurisdiction over the person. *Toth*, however, deals with the connection between an ex-service member and the military, and analysis of it yields points of reference that can appropriately be treated as criteria. They are:

1. Would trial of the ex-service member further the "primary" function of the military "to fight or be ready to fight wars," rather than the "incidental" purpose of maintaining discipline within the service? 350 U.S. at 17, 22–23, 76 S.Ct. at 5, 8.

2. Would the particular extension of military authority over the ex-service member "actually and potentially" sweep under military jurisdiction a great number of persons not otherwise subject to military law? *Id.* at 19–20, 22–23, 76 S.Ct. at 6–7, 8.

3. Is the scope of the extension of court-martial jurisdiction limited to " '*the least possible power adequate to the end proposed* ' "? *Id.* at 23, 76 S.Ct. at 8.

Whatever might be the effect of fraud in other transactions, I am certain that a fraud that procures separation from active duty impairs the ability of the service to meet its primary function. Viewed from the standpoint of its practical consequences upon the service member's unit, fraudulent procurement of the member's separation is the functional equivalent of the member's desertion. Both acts directly diminish the unit's readiness and capability to perform its mission.

As to the second criterion, unlike subdivision (a) of Article 3, subdivision (b) does not sweep into military jurisdiction *all* ex-service members but only those who fraudulently procure release from active duty. Similarly, the extension applies to a single offense that is not normally cognizable by

civilian courts, not to a vast variety of offenses that might otherwise be triable in a civilian court. *See* 350 U.S. at 19, 76 S.Ct. at 6.

■ Turning to whether the jurisdiction conferred by Congress is " '*the least possible power adequate to the end proposed* ' " (*id.* at 23, 76 S.Ct. at 8), it may be that the time for its continuation is too long, even as restricted by the statute of limitations. The separated member's term of obligated service could expire before the running of the period of limitations. Expiration of a term of service does not automatically result in a change of status from military to civilian,[6] but, arguably, application of that principle to a person physically out of the service might be inappropriate. I need not, however, press the argument to decision. Petitioner had more than three years remaining on her obligated tour when Article 3(b) was invoked against her. All actions taken against her have been well within the period of limitations. *See* Article 43(c), UCMJ, 10 U.S.C. § 843(c).

Without deciding whether satisfaction of any one of the criteria is alone sufficient to support continuation of court-martial jurisdiction, as provided in Article 3(b), I conclude that all the *Toth* criteria are met, and that petitioner is subject to court-martial jurisdiction under Article 3(b).

■ In *United States v. Keaton*, 19 U.S. C.M.A. 64, 67 n. 3, 41 C.M.R. 64, 67 n. 3 (1969), this Court remarked that the power of Congress "to make Rules for the Government" of the armed forces must be construed in conjunction with its authority "[t]o make all Laws which shall be necessary and proper for carrying into Execution" that power.[7] I am satisfied that in

---

6. *United States v. Smith*, 4 M.J. 265, 267 (C.M.A.1978); *United States v. Dickenson*, 6 U.S.C.M.A. 438, 448, 20 C.M.R. 154, 164 (1955).

7. In *Reid v. Covert, supra,* some language in Mr. Justice Black's opinion for himself and three other Justices suggests that the "necessary and proper" clause cannot augment the authority of Congress under U.S.Const. art. I, § 8, cl. 14. However, four other Justices did not accept that limitation on the applicability of

the "necessary and proper" clause to all the specific powers conferred upon Congress. *See* 354 U.S. at 42, 77 S.Ct. at 1243 (Frankfurter, J., concurring in the result); *id.* at 68, 77 S.Ct. at 1257 (Harlan, J., concurring in the result); and dissenting opinion of Justices Clark and Burton. This Court, therefore, was free to construe the Constitution as it did.

enacting Article 3(b), Congress did not improperly "encompass [under court-martial jurisdiction] persons who cannot be fairly said to be 'in' the military service." *Reid v. Covert*, 354 U.S. 1, 22, 77 S.Ct. 1222, 1233, 1 L.Ed.2d 1148 (1957). Congress could have authorized trial by a federal civilian court for the fraud alleged to have been committed by petitioner. *Toth v. Quarles, supra* 350 U.S. at 21, 76 S.Ct. at 7. That it did not do so did not foreclose exercise of its constitutional authority to vest jurisdiction over the offense in a court-martial.[8] Such vesting impresses me as a uniquely "necessary and proper" means to effectuate the power of Congress to raise and govern the armed forces. I iterate, therefore, that in enacting Article 3(b), Congress properly exercised its constitutional power to govern the armed forces.[9]

### III. PETITIONER'S IMPLIED DUE PROCESS CHALLENGE TO THE PROCEEDINGS AGAINST HER

■ Petitioner challenges a number of the government's actions previous to referral of the charge to trial. She contends, for example, that the order directing her separation was revoked "unilaterally," and, thus she was deprived of the opportunity to be heard on the issue. A number of federal courts have upheld similar "unilateral" decisions. *Hironimus v. Durant*, 168 F.2d 288 (4th Cir. 1948), *cert. denied*, 335 U.S. 818, 69 S.Ct. 40, 93 L.Ed. 373 (1948); *Neary v. Greenough*, 120 F.Supp. 833 (D.Me.1954); *O'Malley v. Hiatt*, 74 F.Supp. 44 (M.D.Pa. 1947). In several cases in this Court, the

parties and the Court have assumed the propriety of unilateral administrative revocation of a discharge or order of separation from active duty, prior to judicial determination of the legality of the separation and its legal consequences. *United States v. Brown, supra; United States v. Scott, supra.*

Whatever purposes revocation of a discharge or separation order may serve administratively, Article 3(b) does not require formal revocation of the written instrument of discharge or separation as a condition to subjecting the former service member to trial on a charge of fraudulent separation. The Article authorizes military apprehension of, and custody over, the individual, until the charge is determined by a court-martial.

Assuredly, the Fourth Amendment guarantees petitioner a hearing in respect to her apprehension and custody. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). The hearing, however, is not to decide the merits of the charge, but to determine whether there is probable cause to believe that the offense charged has been committed and the person apprehended committed it; and if probable cause is found to exist, to consider what restraints, if any, should be imposed upon the individual's liberty pending judicial determination of the charge. *United States v. Heard*, 3 M.J. 14 (C.M.A.1977). It does not appear that petitioner was accorded that sort of hearing. But, since the Court's issuance of a stay of proceedings, she seems to have freed herself from all military restraint.

---

8. In his dissent, Chief Judge Everett maintains that only a civilian court can properly determine whether petitioner obtained her separation through fraud. A trial court also has jurisdiction to determine whether it has jurisdiction. We have observed that principle in cases where the defense is that the accused was not legally inducted into the service (*United States v. Russo*, 1 M.J. 134 (C.M.A.1975); *United States v. Blanton*, 7 U.S.C.M.A. 664, 23 C.M.R. 128 (1957)) and in cases where the accused has been separated from the service, and the separation was later revoked. *United States v. Brown*, 12 U.S.C.M.A. 693, 31 C.M.R. 279 (1962); *United States v. Wheeler*, 10 U.S.C. M.A. 646, 28 C.M.R. 212 (1959). I discern no

merit in the argument that only a civilian court can pass on the legality of petitioner's separation.

9. In view of my conclusion that court-martial jurisdiction exists under Article 3(b), UCMJ, 10 U.S.C. § 803(b), I need not consider the validity of the agreement of the parties that Article 2(a)(3) does "not establish a basis for *in personam* court-martial jurisdiction over the petitioner. *United States v. Schuering*, 16 USCMA 324, 36 CMR 480 (1966)," or whether, as Judge Fletcher indicates in his separate opinion, another provision of that Article may be applicable.

Should she eventually be tried, convicted, and sentenced to a period of confinement, she can move for administrative credit for any part of the period of restraint deemed to be illegal. *United States v. Larner*, 1 M.J. 371 (C.M.A.1976).

One further aspect of the proceedings in the command merits consideration. As indicated earlier, petitioner has discontinued performance of military duties assigned to her. Article 3(b) says nothing about a dischargee's obligation to perform military duty when taken into military custody on a charge of fraudulent procurement of the discharge. Until the charge is determined, it is nothing more than a charge. Only if the charge is proven or confessed can it be said that accused's status as a member of the military was not lawfully terminated.

Congress has provided in Article 3(b) that a court-martial shall determine whether the dischargee procured separation from the service by fraud. If the court-martial acquits the dischargee, it is more likely than not that he is "actually" a civilian. An acquittal casts doubt on the validity of a pretrial unilateral administrative revocation of the separation. Although the standard of proof of guilt in a criminal case is more demanding than that for proof of a claim in a civil suit, it may be that Congress nonetheless intended the government's failure to convince a court-martial that separation from the service had been procured by fraudulent means to operate as a bar to further administrative consideration of the validity of the separation. But if, despite the acquittal, the Government can properly reexamine the issue administratively, petitioner may well have a due-process right to a hearing, with full opportunity to challenge the government's evidence and to present her own, before she can be required to perform military duties. *See Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). I need not, however, decide these issues. Petitioner is not now performing military duties. She is, however, constitutionally subject to trial by court-martial on the charge of fraudulent procurement of her separation; and the Army provides an appropriate forum for consideration of the conditions of her custody, pending determination of the charge.

I conclude that petitioner is not entitled to any relief and that the stay of proceedings heretofore entered, should be dissolved.

### DISPOSITION

Chief Judge Everett and I disagree as to the merits of the petition, while Judge Fletcher votes to dismiss the petition without deciding the merits. The result is that the petition for extraordinary relief is not granted, and the stay of proceedings is dissolved. Rule 5(a), Rules of Practice and Procedure, United States Court of Military Appeals, 4 M.J. XCVIII.

FLETCHER, Judge (concurring in the result):

My Brothers, as in the past,[1] proceed to answer a legal question in the abstract before they have a proper record of the facts as found by a court lawfully empowered to make such determinations. As a result, they anticipate constitutional questions not necessarily raised in the case.

The initial question to be decided in this case is under what statute does the Government assert court-martial jurisdiction over petitioner? Petitioner asserts that she was discharged from the military on October 15, 1980. Accordingly, she states that court-martial jurisdiction could only be exercised over her under Article 3(b), Uniform Code of Military Justice, 10 U.S.C. § 803(b), but she argues that provision is unconstitutional.

The exhibits attached to the papers filed in this case clearly state that petitioner was released from active duty and assigned to an inactive reserve unit to complete her service obligation. Whether court-martial jurisdiction can be exercised over her under the circumstances of this case is a mixed question of fact and statutory law to be decided by the military judge under Article 2(a)(1), UCMJ, 10 U.S.C. § 802(a)(1).

---

1. *Cooke v. Ellis, et. al,* 12 M. J. 17 (C.M.A. 1981).

I would dismiss the petition for extraordinary relief.

If petitioner objects to the military judge's deciding this question concerning her military status, she might seek appropriate relief in a federal district court. *See Schlesinger v. Councilman*, 420 U.S. 738, 759–60, 95 S.Ct. 1300, 1313–14, 43 L.Ed.2d 591 (1975).

EVERETT, Chief Judge (dissenting):

I

At the threshold the Government contends that, regardless of the answer that might be given on the jurisdictional issue raised by petitioner, her extraordinary relief petition should be dismissed. In that event, the issue would initially be decided by the trial court, which can consider the relevant facts and make appropriate findings; thereafter petitioner can appeal any adverse decision.[1] For several reasons, dismissal of the petition on such grounds appears inappropriate in this case.

Of course, excessive use of this Court's extraordinary relief powers is undesirable; extraordinary remedies should be reserved for extraordinary cases. However, the case at bar falls into that category. For one thing, the issue presented here of the constitutionality of Article 3(b), Uniform Code of Military Justice, 10 U.S.C. § 803(b), has apparently not been adjudicated during the thirty years of the Code's existence. More important, the issue raised here is of a type which the Supreme Court has considered distinctive enough to warrant relaxation of the usual requirement that military remedies be exhausted. *See Schlesinger v. Councilman*, 420 U.S. 738, 759, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975); *Noyd v. Bond*, 395 U.S. 683, 696 n.8, 89 S.Ct. 1876, 1884, 23 L.Ed.2d 631 (1969). Thus, Toth was not required to undergo trial before he could contest court-martial jurisdiction by means of a habeas corpus proceeding in a federal district court. *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955). Nor was such a requirement imposed on Mrs. Covert in connection with her challenge of military jurisdiction. *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). *Cf. McElroy v. United States ex rel. Guagliardo* and *Wilson v. Bohlender*, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960); *Grisham v. Hagan*, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 270 (1960); *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960). Likewise, a writ of habeas corpus in a Federal district court could be utilized by an accused facing trial by court-martial who claimed that he had never been "actually inducted" into the Army. *Billings v. Truesdell*, 321 U.S. 542, 543, 64 S.Ct. 737, 739, 88 L.Ed. 917 (1944); *cf. Parisi v. Davidson*, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). Since the Supreme Court treats as unique for purposes of exhaustion of remedies those cases in which an accused attacks the jurisdiction of a court-martial on the ground that he is not a member of the "land and naval Forces," U.S.Const. art. I, § 8, cl. 14, such cases should also pass muster as "extraordinary" for our purposes.

Often a petition for extraordinary relief raises factual issues; under those circumstances it may be desirable to have the benefit of determinations that can be made by the court-martial at trial.[2] However, in the case at bar, resolution of the underlying legal issue—the constitutionality of the Army's endeavor to try petitioner by court-martial—does not require resolution of disputed facts. Moreover, a need exists for our Court to provide authoritative guidance as to the scope and validity of Article 3(b) —a statutory provision as to which precedent is lacking. If, however, we dismiss the

1. Of course, if the Government were to lose at the trial level, it might view more favorably the invocation of our Court's extraordinary relief powers. *Cf. United States v. Redding*, 11 M.J. 100 (C.M.A.1981).

2. As an aid in the exercise of this Court's jurisdiction, we have occasionally directed that a hearing be conducted before a military judge, whose findings would be reported directly to us. *See, e. g., United States v. Vietor*, 10 M.J. 69 (C.M.A.1980); *United States v. Killebrew*, 9 M.J. 154 (C.M.A.1980).

petition without considering the merits, and petitioner is tried by court-martial and acquitted, our opportunity to provide guidance will be lost, for the case will never reach our Court on appeal. In the event of an acquittal, it is unclear when the jurisdictional issue will reach us in some other case.

Of course, should we dismiss the petition without reaching the merits, the issue now presented to us will probably be decided by a federal district court in some future collateral attack. *Cf. Parisi v. Davidson, supra.* According to one view, this provides another reason for us to avoid the problem by dismissing the petition. My view, however, is exactly to the contrary, for I infer that, in creating our Court, Congress sought to reduce, if not eliminate, the occasions for a service member to resort to a federal district court for relief in matters involving military justice. When we fail to rule on the merits in a case like this and thereby invite resort to the federal district courts, we are negating the very purpose for which this Court was established.

## II

Despite Judge Cook's persuasive opinion to the contrary, I conclude that petitioner is not subject to court-martial at this time. While Article 3(b) was enacted by Congress to deal with the very type of misconduct with which petitioner is charged,[3] the decision in *Toth v. Quarles, supra,* is a barrier to the use of that provision of the Uniform Code. Even if procured by petitioner's misrepresentation that she was pregnant, her separation from the Army precludes her prosecution in a military tribunal until the separation has been invalidated in a federal civil court.

If the signature of the person who attested to petitioner's Department of Defense (DD) Form 214, which evidenced her separation, had been forged, the document would have no legal effect and prosecution by court-martial could proceed. However, when the separation has been procured by fraud—as allegedly occurred in the case at hand—the import of the separation is quite different: it is voidable, rather than void. Thus, if the Government so chose, it could waive the fraud and treat the fraudulent separation as valid; in that event no new DD Form 214 or other document would be necessary in order to place petitioner outside the military community.[4]

In this case, petitioner's separation orders have apparently been revoked *ex parte* by a military commander, and the Army insists that now she is again a member of the military community. Accordingly, the Army claims the right to take petitioner into custody, if necessary, so that she may be brought before a court-martial for trial on a charge of violating Article 83, UCMJ, 10 U.S.C. § 883; but if she were seized by military authorities, it is unclear what hearing, if any, would be available to test the existence of probable cause to hold her in custody. *Cf. Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Moreover, under the Army's theory, it is somewhat unclear whether her status was civilian or military before her separation orders were revoked. Thus, if she is tried by court-martial and acquitted, will the findings also imply that she has really been a civilian all along, even though the Army has attempted to exercise control over her?

---

**3.** I reject the technical argument that Article 3(b), Uniform Code of Military Justice, 10 U.S.C. § 803(b), which applies to persons "fraudulently" "discharged from the armed forces," does not encompass petitioner, who was "separated." The word "discharge" in Article 3(b) was undoubtedly intended by Congress to include any "separation" that could be prosecuted under Article 83, UCMJ, 10 U.S.C. § 883. The interchangeability of "discharge" and "separation" for these purposes of jurisdiction is evidenced by the Army's use of the same document to attest either event. Thus, peti-

tioner was furnished a Department of Defense Form 214, which is entitled "Certificate of Release or Discharge from Active Duty."

**4.** In a way, the situation is the obverse of that which is frequently encountered in connection with fraudulent enlistments. In most instances, such an enlistment is only voidable, not void; therefore it changes the status of the enlistee. *Cf. In re Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); Pub.L. 96–107, § 801, 93 Stat. 810–811 (10 U.S.C. § 802) (amending Article 2, UCMJ, 10 U.S.C. § 802).

In that event, would she be entitled to military pay for the period of time subsequent to her receipt of the contested discharge when it finally appears that she actually was a civilian? If the charges prove groundless, is petitioner entitled to damages for having been deprived of her liberty while awaiting trial?

The Supreme Court has displayed great reluctance to allow trial by court-martial of persons who are civilians. *See, e. g., McElroy v. Guagliardo,* and *Wilson v. Bohlender, supra; Grisham v. Hagan, supra; Kinsella v. Singleton, supra; Reid v. Covert, supra; Toth v. Quarles, supra.* Thus, as noted earlier, the exhaustion-of-remedies doctrine has not hindered the access to habeas corpus relief in such cases. In view of the Supreme Court's emphasis on restricting military jurisdiction to persons who are clearly members of the armed forces, no room is left for the procedure which Congress authorized in Article 3(b), whereunder, in a trial by court-martial for alleged violation of Article 83 of the Uniform Code, it is determined whether a discharge certificate was procured by fraud. Ironically, the very act which consummates the violation of Article 83 changes petitioner's status from military to civilian and acts as a bar to trial by court-martial, unless the discharge has been for purposes of reenlistment.[5]

Of course, the Government should not be left remediless; fortunately several remedies do seem to be available in this situation. Criminal prosecution in a federal district court may be one possibility. *See, e.* g., 18 U.S.C. §§ 287, 1001. Secondly, in a civil action, where the requirement of proof beyond a reasonable doubt would not apply, the Government could seek a judgment that the discharge had been fraudulently obtained and so should be set aside. Once the discharge had been set aside because of its fraudulent procurement, petitioner would be subject to trial by court-martial under Article 83, as well as on any other charges of misconduct occurring either before or after the fraudulent discharge had originally been issued. Moreover, the absence from military duties pursuant to the discharge that later had been set aside by decree of a civil court would be unauthorized.

The availability of alternative remedies which do not raise constitutional questions helps convince me that Article 3(b) does not comply with the test of limitation to "the least possible power adequate to the end proposed." *Anderson v. Dunn,* 6 Wheat. 204, 231, 5 L.Ed. 242, 248 (1821). *See Toth v. Quarles, supra,* 350 U.S. at 23, 76 S.Ct. at 8. Furthermore, the military necessity for upholding Article 3(b) is difficult to discern, since prior to this case the Armed Services seem to have gotten along for three decades without invoking this provision of the Code. On the other hand, to allow the exercise of military jurisdiction in this case places over the head of every veteran a threat that, without a hearing, he may be seized by military authorities to face trial by court-martial on the charge that his discharge from the Armed Services was procured by fraud.

---

5. If a fraudulent discharge were obtained in connection with reenlistment, a different ra- tionale might apply. *Cf. United States v. Gallagher,* 7 U.S.C.M.A. 506, 22 C.M.R. 296 (1957).