UNITED STATES, Appellee

v.

Nicholas A. HARMON, Private
U.S. Marine Corps, Appellant

No. 05-0172

Crim. App. No. 200300683

United States Court of Appeals for the Armed Forces

Argued October 11, 2005

Decided April 27, 2006

CRAWFORD, J., delivered the opinion of the Court, in which
GIERKE, C.J., and EFFRON and BAKER, JJ., joined.  ERDMANN, J.,
filed a dissenting opinion.

<u>Counsel</u>

For Appellant:  Lieutenant <u>Robert E. Salyer</u>, JAGC, USN (argued).

For Appellee:  Major <u>Kevin C. Harris</u>, USMC (argued); <u>Commander
Charles N. Purnell</u>, JAGC, USN (on brief); <u>Colonel William K.
Lietzau</u>, USMC.

Military Judge:  M. H. Sitler

<u>**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION**</u>.

United States v. Harmon, No. 05-0172/MC

Judge CRAWFORD delivered the opinion of the Court.

Pursuant to his pleas, Appellant was convicted of attempted kidnapping, attempted robbery, and two specifications of conspiracy in violation of Articles 80 and 81, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 881 (2000), respectively. Pursuant to a pretrial agreement, the convening authority approved the sentence of a dishonorable discharge, ten years of confinement, and forfeiture of all pay and allowances, but suspended confinement in excess of seven years. The Court of Criminal Appeals affirmed the findings and sentence. United States v. Harmon, 60 M.J. 776 (N-M. Ct. Crim. App. 2004).

ISSUE

WHETHER THE LOWER COURT ERRED BY HOLDING THAT FOR
THE PURPOSES OF R.C.M. 202(c), COURT-MARTIAL
JURISDICTION ATTACHES AT THE MOMENT A CRIMINAL
INVESTIGATION DIVISION AGENT RECEIVES AN ALLEGATION
OF A CRIME AND AN ALLEGATION OF A PERPETRATOR OF
SAID CRIME.

We uphold the finding of the military judge "that the accused's status as an active duty service member would not terminate until 2359 on 17 May 2001."

FACTS

Appellant was a twenty-year-old private in the Marine Corps with about two years of service at the time of these offenses. In the spring of 2001, Appellant's battalion commander recommended Appellant for an administrative separation for drug

2

abuse.  The Commanding General, 2d Force Service Support Group, directed that Appellant be separated from the military no later than May 17, 2001.  Appellant acknowledged his rights and waived his right to a hearing before a board of officers.  Between May 9, 2001, and May 16, 2001, Appellant went through the steps to out-process from the military.  By the morning of May 17, 2001, Appellant had completed all the steps to out-process except picking up his "Certificate of Release or Discharge from Active Duty" (DD Form 214) from the Group Consolidated Administrative Center (GCAC).

As part of Appellant's out-processing, a "Separation/Travel Pay Certificate" (NAVMC 11060 Form) was prepared on May 9, 2001. This document serves as the "orders" for Marines separated without orders.  A servicemember can use this document to obtain advance travel and final pay, to have his or her household goods shipped, or to obtain government-procured transportation for air or bus travel.  Appellant would have received a copy of this document as part of his out-processing.

On Appellant's NAVMC 11060 Form, under the "Pay Information" section, there is a notation of "2359/2001 05 17" typed after the unchecked block that reads "LEAVE AWAITING SEPARATION FROM (TIME AND DATE) _____ TO (TIME AND DATE) 2359/2001 05 17."  The block "OTHER" is checked and the following information is typed in on the form after "OTHER":

3

"SNM Request final payment be made by EFT."  Based on the information on this form, Appellant elected to receive his final pay by electronic funds transfer and the disbursing office was to pay Appellant until 2359 hours on May 17, 2001.

Prior to May 17, 2001, Appellant and another Marine from his unit, Private (PVT) John L. Piazza, conspired to rob a third member of their command, Hospitalman (HN) Eric L. Madden. Although Appellant and PVT Piazza took steps to carry out their plan, their attempts failed and they called off the robbery on the evening of May 16, 2001.

On the morning of May 17, 2001, Appellant convinced PVT Piazza to assist him and they devised another plan to carry out their robbery scheme.  At approximately 5:00 a.m. on May 17, 2001, they attempted to carry out the plan in the parking lot of the barracks.  They concealed themselves in some bushes near the barracks parking lot.  Appellant wore a ski mask to conceal his identity.  At about 5:20 a.m., HN Madden was crossing the parking lot.  Appellant ambushed HN Madden and placed a BB pistol against HN Madden's back.  He demanded the keys to HN Madden's truck.  Hn Madden reached into his pocket for his keys and produced a knife.  In the ensuing struggle, HN Madden cut Appellant on the hand.  PVT Piazza joined the affray and succeeded in separating Appellant from HN Madden.  Appellant and PVT Piazza ran off.

4

At approximately 5:45 a.m., HN Madden reported the attempted robbery and kidnapping to the military police. He also gave a description of Appellant. Shortly after 8:00 a.m., an investigator with the Criminal Investigation Division (CID) interviewed HN Madden who identified Appellant and indicated that Appellant lived in either room 126 or 127 of barracks FC-571. The investigator went to the crime scene to evaluate the situation and seize any evidence.

In the meantime, at approximately 7:30 a.m., Appellant reported to the Separations Office of the GCAC to obtain his discharge paperwork. He was informed he had to return there at about 9:00 a.m., which he did. At that time, the separations clerk gave Appellant the original (Copy 1) and Copy 4 of his DD Form 214. On the DD Form 214, the date of separation was annotated in Block 12b, Separation Date This Period, as "2001 05 17." Appellant's terminal date for his reserve obligation was annotated in Block 6, Reserve Obligation Termination Date, as "20010517." At that time, there were no further administrative or other clearing processes Appellant needed to perform to accomplish discharge.

During the motion session, Chief Warrant Officer-2 (CWO2) Rochelle Bilski, Officer in Charge of the Separation Section of the GCAC, testified that based on the information on the NAVMC 11060 Form, Appellant was on active duty until 2359 hours on May

5

17, 2001.  CWO2 Bilski stated that as a matter of policy and administrative convenience, the discharge paperwork is not held until 2359 to give to the separated Marine.  She stated that there would be no Marines from the GCAC available to give the departing Marines their discharge papers at midnight.  She claimed, however, it is normal practice for the clerks in the GCAC office to remind departing Marines that they are on active duty and subject to the UCMJ until 2359 of the day they are discharged so they will not do anything "stupid."

After receiving his DD Form 214, Appellant left the base and purchased a bus ticket.  He returned to the installation briefly.  After he left the installation, he went to the home of a friend in the civilian community of Jacksonville, North Carolina.

Based on information that Appellant was a suspect in the robbery, the command notified the GCAC to place a legal hold on Appellant and not to deliver his DD Form 214.  However, Appellant had already received his DD Form 214.  At 3:00 p.m., Appellant's commander issued a "Deserter/Absentee Wanted by the Armed Forces" (DD Form 553) for his apprehension.  On that same day, the Commanding General, 2d Force Service Support Group, revoked Appellant's administrative discharge and directed that Appellant's separation be held in abeyance pending the

6

investigation and disposition of the attempted robbery allegations.

About 5:00 p.m. that day, Appellant was taken into custody in the civilian community.  He was placed in pretrial confinement where he remained until trial.

At trial, Appellant moved to dismiss the charges and specifications, arguing that he had been discharged and was no longer subject to in personam court-martial jurisdiction.  The military judge denied the motion to dismiss the charges for lack of personal jurisdiction.  He found that the discharge documents indicated the discharge authority intended for Appellant's discharge to become effective at 2359 on May 17, 2001, thus, Appellant's status as a military member continued until that time.  Because the command acted to revoke the discharge prior to that time, Appellant's military status was not terminated on May 17, 2001, and the court-martial had personal jurisdiction over Appellant.

Appellant renewed his argument at the Court of Criminal Appeals.  The Court of Criminal Appeals held "an investigatory action constitutes sufficient official action to preserve military jurisdiction" and that "because the investigation of serious violations of the UCMJ was initiated and focused on Appellant before delivery of his discharge, we find that jurisdiction of Appellant attached prior to 0900 hours on 17 May

7

2001." Harmon, 60 M.J. at 779. That court did not review the military judge's determination that the effective time of separation was 2359 because it concluded that jurisdiction attached prior to the 9:00 a.m. delivery of the DD Form 214. Id. at 780.

### DISCUSSION

Jurisdiction is the power of a court to try and determine a case and to render a valid judgment. Jurisdiction "is a legal question which we review de novo." See, e.g., United States v. Henderson, 59 M.J. 350, 352 (C.A.A.F. 2004). Generally, there are three prerequisites that must be met for courts-martial jurisdiction to vest: (1) jurisdiction over the offense, (2) personal jurisdiction over the accused, and (3) a properly convened and composed court-martial. See Rule for Courts-Martial (R.C.M.) 201(b). The focus in this case is whether the court-martial had personal or in personam jurisdiction over Appellant at the time of trial.

"Members of a regular component of the armed forces, including those awaiting discharge after expiration of their terms of enlistment" are subject to the UCMJ. Article 2(a)(1), UCMJ, 10 U.S.C. § 802(a)(1) (2000). Generally, "a person becomes subject to court-martial jurisdiction upon enlistment in or induction into the armed forces . . . . Court-martial jurisdiction over active duty personnel ordinarily ends on

8

delivery of a discharge certificate or its equivalent to the person concerned issued pursuant to competent orders." R.C.M. 202(a) Discussion (2). Thus, military jurisdiction over the person continues as long as military status exists. Solorio v. United States, 483 U.S. 435, 439 (1987) (jurisdiction of a court-martial depends solely on the accused's status as a member of the armed forces).

"A member of an armed force may not be discharged or released from active duty until his discharge certificate . . . and his final pay or a substantial part of that pay, are ready for delivery to him . . . ." 10 U.S.C. § 1168(a) (2000). To effectuate an early discharge, there must be: (1) a delivery of a valid discharge certificate; (2) a final accounting of pay; and (3) the undergoing of a "clearing" process as required under appropriate service regulations to separate the member from military service. United States v. King, 27 M.J. 327, 329 (C.M.A. 1989) (discharge certificate delivered to sailor for the purposes of executing a reenlistment does not deprive military authorities of court-martial jurisdiction).

If an individual commits an offense before his official discharge, and the military initiates action with a view to trial, the individual may be retained in the service for trial. R.C.M. 202(c)(1). "If jurisdiction has attached [by the commencement of action] before the effective terminal date of

self-executing orders,[1] the person may be held for trial by court-martial beyond the effective terminal date."  R.C.M. 202(c)(1) Discussion.  "Actions by which court-martial jurisdiction attaches include:  apprehension; imposition of restraint, such as restriction, arrest, or confinement; and preferral of charges."  R.C.M. 202(c)(2).

Delivery of a valid discharge can operate as a termination of court-martial in personam jurisdiction.  See Smith v. Vanderbush, 47 M.J. 56, 58 (C.A.A.F. 1997) (in personam jurisdiction was lost when accused was discharged after arraignment but before lawful authority resolved the charges and the Court found no evidence that the discharge authority intended to discharge the accused on his expiration term of service (ETS)).  However, the discharge authority must have intended the discharge to take effect.  See United States v. Batchelder, 41 M.J. 337, 339 (C.A.A.F. 1994) (it was clear from face of certificate the commander did not intend the discharge to take effect until later).

Military services are required to ensure that "every member . . . being separated from the Military Services is given a completed DD Form 214 describing relevant data regarding the

---

[1] Self-executing orders are those that "by their own terms automatically become effective on the specified effective date without any further action being required."  United States v. Smith, 4 M.J. 265, 266 n.3 (C.M.A. 1978).

10

member's service, and the circumstances of termination. . . . DD Forms 214 are not intended to have any legal effect on termination of the member's service." Dep't of Defense, Instr. 1336.1, Certificate of Release or Discharge from Active Duty (DD Form 214/5 Series) para. 3.2 (Jan. 6, 1989, incorporating through Change 3, Feb. 28, 2003) (emphasis added).

At the time of the incident in this case, the Marine Corps Separation and Retirement Manual (MARCORSEPMAN), Marine Corps Order (MCO) P1900.16E ch. 1, para. 1007(1), at 1-22 (Aug. 18, 1995),[2] provided that "[a] discharge or separation takes effect upon delivery of a valid discharge or separation document." However, paragraph 3 1007(3) recognized that "[f]or the purpose of entitlement benefits administered by the Department of Veterans Affairs (DVA), 38 U.S.C. 106(c) provides that a Marine discharged or released from a period of active duty shall be deemed to have continued on active duty . . . until midnight of the date of such discharge or release." Id. at 1-23.

Although physical delivery of a discharge certificate is generally considered the event that terminates a servicemember's

---

[2] Although MCO P1900.16F replaced MCO P1900.16E on May 30, 2001, the relevant language in paragraph 1007 remained the same. MARCORSEPMAN, MCO P1900.16F, ch. 1, para. 1007(1), at 1-20 (May 30, 2001). On July 18, 2003, paragraph 1007 of MCO P1900.16F was modified to specify the effective "time" of the discharge as 2359 on the date of the discharge or separation. MARCORSEPMAN, MCO P1900.16F, ch. 1, para. 1007(1), at 1-20 (July 18, 2003).

11

active duty status, it is crucial to consider the intent of the command to determine the actual effective time and date of discharge.  See United States v. Melanson, 53 M.J. 1, 4 (C.A.A.F. 2000) (jurisdiction existed because pursuant to Dep't of the Army, Reg. 635-200, a discharge takes effect at 2400 hours on the date of notice of discharge to the soldier); Batchelder, 41 M.J. at 339 (delivery of a discharge certificate for administrative convenience does not terminate jurisdiction when a certificate is clear on its face that the commander did not intend that the discharge take effect until a later time). See also Hamon v. United States, 10 Cl. Ct. 681, 683 (1986) (legislative history indicates that 10 U.S.C. § 1168(a) is not concerned with the actual receipt of the discharge documents, but rather with facilitating the veteran's return to civilian life and that all that is required is that the discharge document be ready for delivery on the separation date).

In this case, Appellant was being administratively separated from the military for misconduct prior to his scheduled end of active service (EAS) date.  His scheduled discharge date, based on the administrative discharge and order of the commander, was established as May 17, 2001.  On May 17, 2001, at 9:00 a.m., Appellant received a copy of his DD Form 214.  The date of his discharge was noted on the DD Form 214, Block 12b, as May 17, 2001.  There was no effective "time" for

12

discharge indicated on the DD Form 214.[3]  At some point during out-processing, Appellant received a copy of the NAVMC 11060. The NAVMC 11060 Form, however, indicated "2359/2001 05 17" as the end date and "time" of Appellant's active duty service.

The DD Form 214 in conjunction with the NAVMC 11060 Form, clearly indicated the command's intent to discharge Appellant at 2359 hours on May 17, 2001.  It was not the command's intent that Appellant's discharge would be effective at some arbitrary point in time when a personnel clerk decided to deliver the copies of the DD Form 214 to Appellant.  Until 2359 hours on May 17, 2001, Appellant "was merely a person in possession of [an order] not yet operative."  Batchelder, 41 M.J. at 339.  See also United States v. Guest, 46 M.J. 778, 780 (A. Ct. Crim. App. 1997) (the intent of parties was germane to whether the courtesy copy of DD Form 214 operated as the official discharge certificate); In re Shattuck, 63 Comp. Gen. 251, 252 (1984)) (the effective date of the discharge is not dependent on the delivery of the certificate but on the intent of the command and servicemember that discharge is effective on a given date).

Prior to 2359 hours on May 17, 2001, the command placed a legal hold on Appellant.  As a result, in personam jurisdiction

---

[3] The Department of Defense instructions and the service instructions or regulations do not require that the effective end of service "time" be included in Blocks 12b or 6 of the DD Form 214.  The instructions only require that the EAS date be noted.

13

over Appellant was never lost.  See United States v. Williams, 53 M.J. 316, 317 (C.A.A.F. 2000) (jurisdiction over the accused did not terminate because a valid legal hold was placed on the accused on the same day the discharge certificate was mailed to him).

In light of our holding, it is not necessary for us to determine whether the court below was correct in concluding that jurisdiction over Appellant attached when Appellant became the focus of a criminal investigation.  We hold that the military judge's findings were correct.  The discharge was not effective until 2359 hours on May 17, 2001.  A valid legal hold was placed on Appellant and his discharge was revoked before the time and date his discharge was supposed to take effect.  Thus, we find the military had in personam jurisdiction over Appellant at the time of his trial.

## DECISION

Accordingly, the findings and the sentence as approved on review below, are affirmed.

United States v. Harmon, No. 05-0172/MC

ERDMANN, Judge (dissenting):

The majority opinion finds that Harmon's status as an active duty member of the Marine Corps did not terminate until 2359 on May 17, 2001 and that his discharge was properly revoked before that time. Because I find that Harmon's discharge was validly completed at 0900, I respectfully dissent.

Harmon was discharged before the end of his term of service and this court has held that three conditions must be met before an early discharge is effective: (1) nonfraudulent and authorized delivery of a valid discharge certificate, (2) a final accounting of pay, and (3) completion of the clearing process required by the service's regulations. United States v. King, 27 M.J. 327, 329 (C.M.A. 1989); see also United States v. Batchelder, 41 M.J. 337, 339 (C.A.A.F. 1994) (holding that early discharge was not valid because the separations clerk was not following the instructed procedures); Wickham v. Hall, 12 M.J. 145, 150 (C.M.A. 1981) (holding that separation from military service procured by fraudulent means is not a valid separation).

There is no dispute that Harmon received a valid discharge certificate -- an original (Copy 1) of his "Certificate Of Release Or Discharge From Active Duty" (DD Form 214) -- at 0900. The facts also establish that there was no further administrative clearing or accounting of pay to be performed when Harmon picked up his discharge certificate. Thus, the

question is whether there was a nonfraudulent and authorized delivery of the DD Form 214.

There has been no assertion at any time that Harmon acted to fraudulently "procure[] his own separation from the armed forces by knowingly false representation or deliberate concealment as to his eligibility for that separation." Article 83(2), Uniform Code of Military Justice, 10 U.S.C. § 883(2) (2000). In fact, there is no dispute that Harmon was eligible for separation as his administrative discharge had been approved and processed. Nor is there any allegation that the clerk who delivered the DD Form 214 to Harmon was working outside his authority.

The majority concludes, however, that Harmon's DD Form 214 did not take effect when it was physically transferred to him at 0900 because the command expressed a clear intent to keep Harmon on active duty until 2359. In reaching this conclusion the majority relies on an entry in Harmon's "Separation/Travel Pay Certificate" (NAVMC 11060 Form) as evidence of the command's intent to extend the effective date of Harmon's discharge and on this court's holding in Batchelder.

NAVMC 11060 Form contains a section entitled "Pay Information". That section has a number of blanks that are to be completed by the command when a person is discharged. One such blank reads as follows: "Leave Awaiting Separation From

2

(Time And Date) _____ To (Time And Date) _____". The official who completed the form did not make an entry in the first blank but in the second blank inserted "2359/2001 05 17". This entry is cited by the majority as evidence of the command's intent to discharge Harmon at 2359 on May 17, 2001.

The entry relied upon by the majority appears to be an entry related to leave that simply indicates the time through which Harmon would be charged leave rather than the effective date of the discharge. This entry on the NAVMC 11060 Form would alert finance authorities to deduct this leave from a Marine's leave balance before determining any separation pay for accrued leave. It appears, however, that Harmon took no leave and this entry is therefore meaningless.

A separate blank on the form does reference the "Effective Date Of Separation From ACDU"[1] and contains the following entry: "2001 05 17". This blank does not ask for the effective "time" of discharge, which is consistent with a Marine Corps regulation in effect at that time that provided that "[a] discharge or separation takes effect upon delivery of a valid discharge or separation document." Marine Corps Separation and Retirement Manual (MARCORSEPMAN), Marine Corps Order (MCO) P1900.16E, ch.

---

[1] "ACDU" is a Navy/Marine Corps abbreviation for "active duty".

1, para. 1007(1) at 1-22 (Aug. 18, 1995).[2] The regulation clearly dictates the effective time of the discharge as the time of delivery, which in this case was 0900. Even if the entry in the pay section of the form did evidence the local commander's intent to extend the effective time of Harmon's discharge, the regulation does not authorize individual commanders to alter the effective time of a discharge. Id.; see also United States v. Wheeler, 27 C.M.R. 981, 989 (A.F.B.R. 1959) ("Regulations issued by the military service on matters within their authority have the force of law if not in conflict with the Constitution or Congressional enactments.").

The majority also relies on Batchelder, where this court held that a discharge did not go into effect when a servicemember received his DD Form 214 because (1) his orders and discharge package clearly identified the discharge time as 2400, and (2) the clerk who delivered the paperwork to Batchelder at 1400 was breaking the command's rules with regard to how discharge paperwork should be handled. 41 M.J. at 339. Here the form does not clearly identify the discharge time, the Marine Corps regulation specified that the discharge was effective upon the delivery of the DD Form 214 and there is no

---

[2] As noted by the majority, this regulation was amended in July 2003 to specify 2359 as the effective time of all discharges. See MARCORSEPMAN, MCO P1900.16F, ch. 1, para. 1007(1), at 1-20 (July 18, 2003).

4

allegation that the clerk who issued the DD Form 214 to Harmon was working outside of his authority.

I also do not agree with the alternative argument presented by the Government -- that the Navy-Marine Corps Court of Criminal Appeals was correct in its conclusion that under Rule for Courts-Martial (R.C.M.) 202(c)(2), court-martial jurisdiction attached before 0900 because action with a view to trial was taken prior to the delivery of the discharge certificate.[3]  United States v. Harmon, 60 M.J. 776, 779 (N-M. Ct. Crim. App. 2004).  Examples of actions with a view to a trial include "apprehension; imposition of restraint, such as restriction, arrest, or confinement; and preferral of charges." R.C.M. 202(c)(2).  We have also held that R.C.M. 202(c)(2) does not provide an exhaustive list and that "other affirmative action can also be taken 'with a view to trial.'"  United States v. Self, 13 M.J. 132, 138 (C.M.A. 1982).  We have further explained that "[a]ny acts of military officials which

---

[3] In Smith v. Vanderbush this court made it clear that once court-martial jurisdiction attaches the command may choose to take steps to defer an upcoming discharge and continue the accused's active service, but such action does not occur automatically.  47 M.J. 56, 58 (C.A.A.F. 1997).  The Navy-Marine Corps court recognized this precedent, but added a qualification to the Vanderbush requirements -- that the command be fully informed about the nature of the investigation at the time the discharge certificate is delivered.  United States v. Harmon, 60 M.J. 776, 779-80 (N-M. Ct. Crim. App. 2004).  This qualification is not supported by Vanderbush or other precedent of this court.

authoritatively presage a court-martial" can constitute actions that trigger the attachment of jurisdiction.  Id.

In Self we concluded that sufficient actions had been taken to create jurisdiction where, prior to receiving his discharge, the accused was identified as a suspect, summoned to the Army Criminal Investigation Division (CID) office, informed of the offenses for which he was being investigated, informed of his rights and then interviewed.  Id.  Here the Government argues that court-martial jurisdiction had attached because "the criminal investigation into the crimes committed upon HN Madden had reach the point where the guilt of Appellant seemed particularly clear."

Sometime between 0815 and 1015 Harmon became a possible suspect based on the victim's statement to the CID that "the suspect may be a PFC Harmon".  The record does not disclose whether this occurred prior to 0900.  At approximately 1020 CID notified Harmon's command that "he was a possible suspect in the investigation" (emphasis added).  At 1500 a "Deserter/Absentee Wanted by the Armed Forces" (DD Form 553) was issued for Harmon's arrest and he was apprehended at approximately 1700.  At most, these facts support a finding that the victim may have identified Harmon as a possible suspect prior to 0900.  They do not support a conclusion that the acts of "military officials .

6

. . authoritatively presage[d] a court-martial" prior to 0900. Self, 13 M.J. at 138.

Harmon was validly discharged at 0900 and there was no in personam jurisdiction over him from that point forward.  For these reasons, I would reverse the decision of the lower court, set aside the findings and sentence and dismiss all charges.