**Major Richard C. ROONEY, Plaintiff,**

v.

**SECRETARY OF THE ARMY, Defendant.**

No. CIV.A. 02–0450(JDB).

United States District Court, District of Columbia.

Nov. 6, 2003.

Eugene R. Fidell, Matthew S. Freedus, Feldesman, Tucker, Leifer, Fidell & Bank LLP, Washington, DC, for Plaintiff.

Ellen A. Cirangle, Stein & Lubin, San Francisco, CA, Of Counsel to Plaintiff.

Thomas M. Ray, Joel E. Wilson, Assistant United States Attorneys, Washington, DC, for Defendant.

**MEMORANDUM OPINION**

BATES, District Judge.

Major Richard C. Rooney ("Rooney"), a physician, asks the Court to declare that he was honorably and irrevocably discharged from the Army on February 5, 2002, that the Army's subsequent attempts to revoke his discharge are void, and that, to the extent that it may be invoked by the Army to annul a discharge without providing a hearing and on the basis of merely "some" evidence of fraud, Army Regulation 135–175 § 1–10b(2) (1987) ("1–10b(2)") violates the due process clause of the Fifth Amendment. The Army maintains that Rooney has an outstanding service obligation, that he fraudulently solicited and obtained his discharge, and that the Army did not offend due process when it revoked the discharge without convening a court martial and based upon an administrative finding.

This is the Court's third pronouncement in this case.[1] Presently at issue are the Army's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment, and Rooney's motion for declaratory judgment and cross-motion for summary judgment.[2] For the reasons elaborated in this opinion, Rooney's motions are denied, the Army's motion to dismiss is denied, and the Army's motion for summary judgment is granted.

**1.** A memorandum opinion and order of September 12, 2002, denied the parties' cross-motions for summary judgment and Rooney's motion for injunctive relief. An order of September 25, 2002, denied Rooney's motion for a temporary restraining order.

**2.** Rooney's filing of December 4, 2002, is styled simply as a cross-motion for summary judgment. Because Part I.B. of that filing contends that declaratory relief is appropriate in this case and rests on cases interpreting the Declaratory Judgment Act ("DJA"), the Court deems it a motion for declaratory judgment.

## I. BACKGROUND

### A. Rooney's Military Career

Upon graduation from the United States Military Academy in 1991, Rooney incurred a five-year active duty service obligation to the Army. *See* 10 U.S.C. § 4348(a)(2)(B). He elected to postpone his required service and pursue a medical education under the Armed Forces Health Professional Scholarship Program. In a service agreement dated July 14, 1991, Rooney promised that, in exchange for the Army's payment of his medical school tuition and expenses, he would incur an additional eight-year service obligation. R. 104–10. He agreed that his time in medical school would not count toward the fulfillment of his active duty requirement. R. 105, ¶ 5.

After four years of medical school, Rooney entered active duty on June 11, 1995, as a captain in the Medical Corps. He spent the next six years performing his residency in orthopedic surgery, rotating through military hospitals in Washington, Alaska, and Hawaii. R. 117, 120–21, 123–25. During that time, Rooney took and passed the physical fitness test required of active duty personnel on four occasions, most recently in April 2001.[3] R. 123, 127, 129, 131.

In September 2000, Rooney had applied to participate in the Army's Nonfunded

**3.** Rooney tore his right anterior cruciate ligament (ACL) and sprained both ankles while a cadet at West Point, and hence was permanently excused from the two-mile run portion of the Army's regular fitness exam. R. 164, 227. Instead, to pass, Rooney had to perform some alternative event (e.g., swimming, walking, or biking) within set time constraints, as well as perform a minimum of 39 push-ups in two minutes and 45 sit-ups in two minutes. R. 267–68.

Graduate Medical Education Program ("NGMEP"), which is administered by the Office of the Surgeon General ("OTSG"). R. 360. NGMEP participants are released from active duty to pursue training at accredited civilian institutions. They must return to active duty upon completion of their training to serve for the length of their remaining service obligation. *See* Army Regulation 351-3 § 6-4 (1988). By a letter from the OTSG dated January 10, 2001, Rooney was informed that he had been selected to participate in the NGMEP and pursue a one-year fellowship in Spine Surgery at the University of Maryland Medical Center.[4] R. 133. "It should be noted," continued the letter, "that participation in the NGMEP mandates a return to active duty immediately upon completion, withdrawal or termination from the training program." *Id.* Rooney accepted the offer by signing and returning the letter on January 26, 2001. He executed a service agreement with the Army detailing the conditions of his participation in the NGMEP on March 21, 2001. R. 134-36; *see* 10 U.S.C. § 3012. In relevant part, the service agreement provides:

5. . . . I [Rooney] certify that—. . . .

 c. The program will begin on **1 September 2001 and end on 31 August 2002.**

 d. My current [active duty service obligation] is **7 years, 8 months, and 16 days.**

 e. My [active duty service obligation] (excluding that incurred for NGMEP participation) on the beginning date of

the training program will be **7 years, 8 months, and 16 days** . . .

7. As a result of my participation in the NGMEP, I understand that—. . . .

 c. I will incur an [active duty service obligation] of 0 years, which may be served concurrently with any other active duty, which will immediately follow the end of my graduate medical education . . . .

 d. No part of any active duty obligation I now have or will incur by my participation in the NGMEP may be satisfied while I am in this program. Therefore, on my return to active duty I will complete any [active duty service obligation] incurred under this program, or the [active duty service obligation] I have listed above, whichever is greater . . . .

 h. While I am in this program, I will immediately notify the commander, U.S. Army Health Professional Support Agency . . . of . . . [any] Service-impairing physical disability.

R. 134-35 (emphasis original). Also in accordance with Army Regulation 351-3, Rooney solicited a voluntary release from active duty from the Army Reserve Personnel Command ("AR–PERSCOM"). AR–PERSCOM issued orders relieving Rooney as of April 16, 2001. R. 152-53. The orders noted that "[p]articipation in the NGMEP mandates a return to active duty immediately upon completion, withdrawal, or termination from the training program. Officer has a remaining service obligation of (7) years, (9) months,[5] (16)

---

4. Sometime before April 16, 2001, Rooney elected to pursue his NGMEP fellowship at the San Diego Center for Spinal Disorders in La Jolla, California, rather than at the University of Maryland.

5. Rooney's transfer to the San Diego Center for Spinal Disorders required him to begin his NGMEP on August 31, rather than August 1,

2002. The original orders authorizing his release from active duty do not recognize this change, and thus overstate by one month his remaining active duty service obligation. A subsequent version of the NGMEP agreement reflects the later date for Rooney's return to active duty. The parties agree that an Army clerk later substituted a new first page of the

sixteen days, upon re-entry onto active duty o/a 1 August 2002, and is to be served concurrently to any obligation incurred as an NGMEP participant; new [active duty service obligation] upon return to active duty will be 17 May 2010." *Id.;* R. 48.

### B. Rooney's Discharge

Before relocating to San Diego from Tripler Army Medical Center in Hawaii, Rooney prepared an application for disability compensation from the Department of Veterans' Affairs ("VA"). The VA received his application on April 25, 2001. R. 200. His chief complaints included chronic pain and instability in his right knee and shoulder, instability in both ankles, and post-traumatic arthritis. R. 154. In a letter dated September 28, 2001, the VA assigned him a combined disability rating of 30% and found him to be entitled to a monthly payment of $298. R. 200. His disability status became effective on September 1, 2001. *Id.* The letter specifically informed Rooney that the VA would be paying him as a veteran. *Id.*

It appears that while his application for disability benefits was pending, Rooney initiated the formal process of obtaining a discharge from the Army. On April 26, 2001, he completed a form entitled "Medical Examination for Separation—Statement of Option." R. 157. By signing it, Rooney represented that he understood that he did not necessarily have to undergo a medical examination to be separated from the Army, but that if a review of his medical records demonstrated that an examination was appropriate, one would be

ordered. He indicated that he did not desire a separation medical examination. Dr. Daniel Nishimoto of the VA also signed the form on the same day, indicating that he had reviewed Rooney's medical records and had determined that no further medical examination was required for Rooney's separation. *Id.*

On or about May 2, 2001, a document purporting to memorialize a medical examination of Rooney was generated over the electronic signature of Lieutenant Colonel David Kim, another physician at Tripler. R. 158–60. The evaluation declared Rooney fit for separation due to his multiple musculoskeletal problems, but also recommended a fuller examination by a medical evaluation board. R. 160. Rooney obtained a second evaluation, dated July 1, 2001, signed by Captain Mark Berkowitz, also a physician at Tripler. The evaluation chronicled Rooney's history of joint dysfunction, concluded that Rooney "should have been discharged" as early as 1998, and found that Rooney could not meet the Army's retention or appointment criteria. R. 163–64. Additionally, on July 16, 2001, Rooney underwent a comprehensive physical examination at the VA clinic in Honolulu. The conducting physician noted Rooney's complaints of joint pain and referenced Dr. Berkowitz's evaluation. R. 168–82.

The Army strongly disputes the reliability of these evaluations. Dr. Kim denies ever having signed the evaluation bearing his electronic signature. R. 398. Accord-

---

NGMEP agreement for the first page of the executed copy, but they dispute the significance of that fact. The Army insists that Rooney knew of and consented to the substitution. D.'s Rep. to Pl.'s Opp. at Ex. 4. Rooney maintains that "Army officials twice changed page one of [the NGMEP] agreement by substituting a page that, unlike the corresponding page of the document he signed,

included a lengthy [active duty service obligation]. Rooney insists that the Army did so without (a) furnishing copies to the plaintiff, (b) advising him that it had inserted an [active duty service obligation] where none existed, or (c) obtaining his knowing consent to that change of a material term." Pl.'s Cr. Mot. at 6.

ing to Dr. Kim, Rooney approached him with the document and asked him to approve it; Dr. Kim alleges that he refused, adding that he "had no knowledge of the contents of the document" and "would never have signed" it. *Id.;* R. 399. He professes not to know how his electronic signature came to appear on the evaluation, but hypothesizes that someone could have logged on to Tripler's computer system using his password, or could have used his computer terminal without his authorization. R. 399. Dr. Kim opines, moreover, that Rooney "performed his job physically well until the date he completed his residency." *Id.* As for Dr. Berkowitz, he recalls signing a document at Rooney's request during a busy day at the orthopedic clinic. Rooney indicated that the document related to his "outprocessing," but did not explain to Dr. Berkowitz that it was a medical evaluation report finding him unfit for duty.[6] R. 401–02. Because Rooney was Dr. Berkowitz's chief resident at the time, it was not uncommon for Dr. Berkowitz to sign papers at Rooney's request. R. 402. Dr. Berkowitz denies ever medically examining Rooney in any way and states that, had Rooney told him "the

true nature of this document or accurately described its contents," he would not have signed it.[7] *Id.*

As his discharge process unfolded, Rooney never alerted OTSG or AR–PERSCOM to his progress toward separation from the Army. R. 4. On May 9, 2001, NGMEP administrator Dolores Pfeiffer sent Rooney a letter confirming his temporary release from active duty and reiterating that his deferment was only for a specified time and purpose. R. 161. On June 12, 2001, apparently in consultation with local recruiters, Rooney completed a Separation Counseling Checklist. On the checklist, he indicated his interest in a number of services provided by the Army to service members entering civilian life: job placement, relocation assistance, education and training, health and life insurance, and financial counseling. R. 192–93. But on June 27, 2001, consistent with Rooney's continued participation in the NGMEP and to accommodate his transfer to San Diego, he wrote to AR–PERSCOM to request that his active duty re-entry date be moved from August 1 to August 31, 2002. R. 144. On July 2, 2001, the day after Rooney had obtained Dr. Berkowitz's

---

**6.** Dr. Berkowitz conjectured that his signature was merely "needed from our section so that [Rooney] could clear the installation," R. 402, presumably a reference to Rooney's impending release from active duty to participate in the NGMEP.

**7.** Rooney does not focus his response on the substantive testimony of Drs. Kim and Berkowitz. Instead, he contends that because both reports were generated after April 25, 2001, they could not have informed the VA's decision to award him disability benefits. Pl.'s Cr. Mot. at 65–66. Resting on the ambiguous first sentence of the VA's letter—"We made a decision on your claim for service connected compensation received on April 25, 2001"—Rooney asserts that the VA made its decision regarding his disability on that date. This is a problematic assertion. First, it facially contradicts Rooney's own statement of

facts, wherein he alleges that "[o]n September 28, 2001, the Department of Veterans Affairs ('VA') found that plaintiff was 30% disabled based on medical conditions that were related to his military service." Pl.'s Cr. Mot. at 3. Second, other facts about the award letter suggest a later decision date: his disability status was not effective until September 1, 2001, and the VA's decision letter itself is dated September 28, 2001. Nor does Rooney allege that he applied for disability benefits on any date before April 25, 2001. Thus, for Rooney to be right about the date on which the VA made its determination, the VA would have had to receive and approve his application on the same day—and then wait over five months before notifying him of its decision. Still, the administrative record does not contain a catalog of the evidence reviewed by the VA in making its decision.

signature on his purported evaluation, OTSG generated a letter confirming Rooney's new re-entry date and reiterating his obligation to return to active duty upon completion of the NGMEP. He received orders from AR–PERSCOM consistent with the new dates on July 17, 2001. The orders directed that he was being released from active duty to participate in the NGMEP as of August 31, 2001, and "not by reason of physical disability." R. 185.

On November 13, 2001, now over two months into his NGMEP fellowship in San Diego, Rooney called the OTSG and spoke with Mrs. Pfeiffer. He told her that he had recently had a bicycle accident, was not functioning in training, and would be unable to fulfill his service obligation to the Army.[8] R. 363. Mrs. Pfeiffer told him that he had to contact the Army Recruiting Command immediately and arrange a physical examination; only after a completed physical was on record could any determination about his fitness for active duty be made. *Id.* An enrollment verification form completed by the San Diego Center for Spinal Disorders and faxed to OTSG on November 19, 2001, did not indicate that Rooney was unable to train due to injuries.[9] *Id.* On December 12, 2001, AR–PERSCOM received a completed form ARPC FL 3937–E from Rooney. R. 371. That form is automatically generated by AR–PERSCOM's computer system and sent to servicemembers when they are re-

quired to undergo a periodic physical examination. On his form, Rooney checked a block indicating that he had completed his statutory or contractual service obligation to the Army, was requesting a discharge, and was thus not obliged to undergo an evaluation. A personnel clerk at AR–PERSCOM entered Rooney's responses into the AR–PERSCOM computer system and, pursuant to policy, destroyed Rooney's actual form. *Id.* Only when a servicemember does not check an exception block indicating that he or she does not need an examination does the AR–PERSCOM team responsible for scheduling physicals contact the servicemember to arrange an examination. R. 394.

Rooney called AR–PERSCOM on January 7, 2002, to inform them that, because he was receiving VA disability benefits, his status had to be updated. He informed Lieutenant Colonel Julio Reyes that he had left active duty, was given a disability rating by the VA, and that he wanted to resign from the Army Reserve. R. 392. He did not tell Reyes that he was an NGMEP program participant or that he had an outstanding active duty service obligation. *Id.* Rooney claims that he was told to resign or forfeit his disability payments; Reyes denies telling Rooney that he could not receive VA benefits while serving in the reserves. *Compare* Pl. Cr. Mot. at 4; R. 392. Rooney mailed a letter resigning his commission on that day, not-

8. Rooney had failed to respond to several letters from the OTSG in the fall of 2001. These involved his compliance with several NGMEP requirements: he had not supplied his new home address and telephone number in San Diego, had failed to complete a required questionnaire, and did not arrange the regular physical exam required of all NGMEP students. R. 363.

9. On the same day, Rooney's wife, also an Army physician, sent an e-mail to her assignments officer requesting a joint assignment

for her and Rooney to Madigan Army Medical Center in Washington. In her e-mail, she stated that her husband had an eight-year commitment to the Army. R. 320. In his subsequent correspondence with Mrs. Rooney, the assignments officer repeatedly stressed the fact that Rooney had failed to maintain contact with OTSG as required by the NGMEP, and that he would be removed from his fellowship and returned to active duty unless he came into compliance. R. 317–19.

ing that he entered into active duty on June 1, 1991, and that he had received a 30% disability rating from the VA. R. 209. His letter made no mention of his NGMEP participation. He did not inform the OTSG of his communications with AR–PERSCOM. R. 363–64, 221. On January 14, 2002, Rooney informed a local Army recruiting official that he should no longer be listed on the Individual Ready Reserve list because he had been medically discharged from active duty, and was in the process of resigning from the Reserves because he was disqualified from military service. R. 412. Rooney indicated that he needed to have an examination to confirm his physical impairment, but the local recruiter responded that his unit could only perform examinations on servicemembers seeking to enter the reserves. *Id.;* R. 225.

Meanwhile, Rooney's letter of resignation made its way through the AR–PERSCOM bureaucracy. AR–PERSCOM's database contained no evidence of Rooney's active duty service obligation;[10] instead, it contained his certification on form ARPC FL 3937–E that he had no outstanding statutory or contractual obligation to the Army. R. 405. Seeing no outstanding duty obligation, Lieutenant Colonel Charles Lusso approved Rooney's discharge from the Army Reserve. *Id.* AR–PERSCOM promulgated Rooney's discharge order on February 5, 2002. R. 220.

On February 13, 2002, Rooney called Mrs. Pfeiffer at OTSG and informed her that he had received a discharge from AR–PERSCOM. R. 363. Mrs. Pfeiffer immediately contacted her liaison at AR–PERSCOM to determine how a discharge could have been issued to Rooney, given that his outstanding service obligation made him ineligible for resignation.[11] *Id.* After Mrs. Pfeiffer reviewed Rooney's case with AR–PERSCOM personnel, an order revoking Rooney's discharge was issued by AR–PERSCOM on February 15, 2002. R. 222. It was mailed to Rooney with a cover letter stating that his discharge order had been published due to administrative error and apologizing for any inconvenience caused by the erroneous discharge. Pl. Cr. Mot., Ex. 4.

Rooney filed a complaint with this Court on March 12, 2002, seeking a declaratory judgment that his February 5, 2002, discharge was effective and that the Army's revocation of it was ineffectual. The complaint relied on the fact that administrative error is not among the permissible reasons for revoking a discharge enumerated in Army Regulation 135–175 § 1–10b, which states:

> b. A discharge order may not be revoked after its effective date provided -
>
> > (1) The order was published from a headquarters authorized to approve the discharge and to issue a discharge certificate (para. 2–8).
> >
> > (2) There is no evidence that the discharge was obtained under fraudulent circumstances.

---

10. Because it is an organ of the Army Reserves, AR–PERSCOM maintains a computer database apart from that of the regular Army. AR–PERSCOM's only evidence of Rooney's active duty obligation resided with its OTSG liaison, and because Rooney had at no point indicated to AR–PERSCOM that he was an NGMEP participant, that liaison was never consulted during AR–PERSCOM's processing of Rooney's resignation request. R. 10.

11. Mrs. Pfeiffer further states that "MAJ Rooney was aware, based on letters sent to him by [OTSG], that his active duty service file would be maintained by this office while he was in the NGMEP. There is no question that had MAJ Rooney informed this office about his resignation, as was his duty to do, we would have immediately contacted AR–PERSCOM and informed them that MAJ Rooney was not eligible to resign, as he had an outstanding [active duty service obligation]." *Id.*

(3) The officer concerned received actual or constructive notice of the discharge.

The Army responded that Rooney's discharge had been procured by, and was revoked based on evidence of, fraud. While the action was pending, consistent with the fact that Rooney's NGMEP fellowship was drawing to an end, the Army issued active duty orders for him on June 10, 2002, directing him to report to Fort Hood, Texas, on September 12, 2002.

Rooney filed an application for injunctive relief on August 22, 2002. In their briefs and at oral argument, the parties agreed that the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, supplied the appropriate framework for reviewing the Army's action and evaluating the record upon which it had revoked the discharge. On September 12, 2002, based on the record then available, the Court vacated the Army's revocation of Rooney's discharge and dismissed as moot his application for injunctive relief, as his discharge was thus technically in force. But the Court concluded that the Army may well have had a basis for revoking Rooney's discharge under 1–10b(2). Accordingly, the Court retained jurisdiction and directed the Army to, within eleven days, proceed along one of two paths: (1) the Army could submit a request for reconsideration of the Court's decision, along with a complete administrative record of the materials before the Army decision-makers as of February 15, 2002, and such supplementary declarations and materials as were required and consistent with *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989); or (2) it could issue a new revocation order based upon all information known by the relevant Army decision-makers as of the time of the revocation order's issuance.

## C. The Subsequent Revocation of Rooney's Discharge

The Army issued a new revocation order on September 20, 2002, and also ordered Rooney to report for active duty at Fort Hood by September 25, 2002. R. 2–3. Colonel Elton C. Bruce, the commanding officer of AR–PERSCOM, summarized his reasons for ordering the revocation in a twelve-page memorandum produced after a review of the administrative record and a legal briefing from AR–PERSCOM's Command Judge Advocate. R. 1–15. The memorandum details Rooney's communications with AR–PERSCOM and OTSG during his participation in the NGMEP. It articulates the ways in which Rooney's stipulations and omissions induced the Army to discharge him, tracing his alleged pattern of misrepresentations from the time of his application for the NGMEP onward. The memorandum concludes that "it is clear that MAJ Rooney engaged in an intentional and protracted pattern of fraudulent misrepresentations and omissions to the Army in an intentional effort to obtain a discharge and thereby avoid his nearly eight year contractual service obligation." R. 15. A certified copy of the administrative record upon which Colonel Bruce relied in revoking the discharge order was filed with the Court on September 24, 2002. Rooney applied orally for a temporary restraining order to prevent the Army from calling him to active duty until the Court resolved the challenge he intended to raise to the September 20, 2002, revocation of his discharge. On September 25, 2002, the Court denied Rooney's application.

Rooney reported for duty at Fort Hood on September 30, 2002. Upon his arrival, he entered into two voluntary special incentive pay agreements with the Army, accepting $51,000 in exchange for a voluntary commitment to serve one year of con-

tinuous active duty through September 2003. D.'s Rep. To Pl.'s Opp., Ex. 1. These agreements are only available upon a soldier's request and affirmation that he or she is an officer in the Medical Corps of the Army. *Id.* at 4. The additional service obligation incurred by such an incentive agreement may be served concurrently with any other active duty service obligation. On his agreement, Rooney made a handwritten note that "[t]his should not prejudice me in my civil litigation versus the Dept. of the Army in Wash. D.C." *Id.*, Ex. 1. On September 3, 2003, Rooney reported to the Court that he, his wife, and son remain at Fort Hood; that his wife was due to leave the Army on October, 10, 2003; and that, but for the Army's belief that Rooney is in the Army, the Rooneys would leave Texas.

## II. DISCUSSION

As a threshold matter, the Army contends that Rooney's recent accession to the voluntary special incentive pay agreements deprives the Court of jurisdiction over Rooney's declaratory judgment action because, notwithstanding his attempted reservation of rights, Rooney's assumption of an additional active duty service obligation deprives him of a live case or controversy amendable to judicial review. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Schering Corp. v. Shalala,* 995 F.2d 1103, 1106 (D.C.Cir.1993) (a case is moot when it "has lost its character as a present, live controversy of the kind that must exist if [the Court] is to avoid adviso-

ry opinions on abstract questions of law"). Alternatively, the Army contends that no genuine issue of material fact precludes summary judgment and that, as a matter of law, it did not act arbitrarily or capriciously in revoking Rooney's discharge on September 20, 2002. Rooney seeks a declaratory judgment that he is a civilian, that the Army's attempt to revoke his discharge on grounds of administrative error finds no support in Army regulations, and that no law or regulation authorizes the revocation of his discharge based on an administrative, rather than a judicial, finding of fraud. Pl.'s Cr. Mot. at 9. He also cross-moves for summary judgment on the following issues: that he has committed no fraud, that the Army's interpretation of 1–10b(2) is inconsistent with the jurisdictional arrangement for courts martial at 10 U.S.C. § 803(b) [12] (" § 803(b)") and violates the due process clause of the Fifth Amendment, and that he has no remaining active duty service obligation. In the alternative, he enumerates genuine issues of material fact preclusive of summary judgment in favor of the Army. *Id.* at 53–64.

### A. Applicable Legal Standards

The Declaratory Judgment Act, 28 U.S.C. § 2201(a) ("DJA") provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and

---

**12.** That provision states:

Each person discharged from the armed forces who is later charged with having fraudulently obtained his discharge is, subject to section 843 of this title [the relevant statute of limitations provision], subject to trial by court-martial on that charge and is after ap-

prehension subject to this chapter while in the custody of the armed forces for that trial. Upon conviction of that charge he is subject to trial by court-martial for all offenses under this chapter committed before the fraudulent discharge.

shall be reviewable as such." 28 U.S.C. § 2201(a). Thus, the existence of an actual case or controversy is a jurisdictional requirement for any action under the DJA just as it is in all cases brought in federal court. *See Valley Forge,* 454 U.S. at 471, 102 S.Ct. 752; *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

 Even where an action satisfies the jurisdictional prerequisites for declaratory judgment, the decision to entertain a claim under the DJA is committed to the discretion of the district court. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 287, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) ("[D]istrict courts' decisions about the propriety of hearing declaratory judgment actions, which are necessarily bound up with their decisions about the propriety of granting declaratory relief, should be reviewed for abuse of discretion."). Factors relevant to the propriety of granting a declaratory judgment include: whether declaratory judgment would finally settle the controversy between the parties, whether other remedies are available or other proceedings pending, the convenience of the parties, the equity of the conduct of the declaratory judgment plaintiff, the prevention of 'procedural fencing,' the state of the record, the degree of adverseness between the parties, and the public importance of the question to be decided. *See Hanes Corp. v. Millard,* 531 F.2d 585, 591 n. 4 (D.C.Cir.1976); *Jackson v. Culinary Sch. of Washington, Ltd.,* 27 F.3d 573, 580 (D.C.Cir.1994); *Mittleman v. United States,* 919 F.Supp. 461, 470 (D.D.C.1995).

The parties' motions for summary judgment come before the Court as would any agency action subject to review based on an administrative record, particularly where assessment of a statute or regulation is required. The Court's review is thus governed by the familiar dictates of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "We start our analysis, as always, by asking whether Congress has spoken to 'the precise question at issue.'" *Wells Fargo Bank, N.A. v. FDIC,* 310 F.3d 202, 205 (D.C.Cir.2002) (quoting *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778). To determine whether Congress has so spoken, we apply "traditional tools of statutory interpretation—text, structure, purpose, and legislative history." *Pharmaceutical Research & Mfrs. of Am. v. Thompson,* 251 F.3d 219, 224 (D.C.Cir.2001). If it has, "the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'" *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778). When the statute is silent or ambiguous on the precise question at issue, the Court turns to *Chevron*'s second step, and defers to the agency's interpretation if it offers a "permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *Consumer Elecs. Ass'n v. FCC,* 347 F.3d 291, 299 (D.C.Cir.2003). Thus, review of the Army's revocation of Rooney's discharge turns on whether the Army's construction of § 803(b) and 1–10b(2) is permissible, and whether the decision to revoke Rooney's discharge was arbitrary, capricious, or otherwise not in accordance with law.[13] *See* D.'s Mot. Sum. J. at 8–9.

13. As he has in prior motions before this Court, Rooney contends that the Army's proposed standard on the issue whether his discharge was fraudulently obtained is contrary to law. Pl.'s Cr. Mot. at 12. The proper standard of review, he says, is the one applied to civil actions for fraud generally. Thus, he argues that the Army must plead the circumstances of his fraud with particularity, Fed. R.Civ.P. 9(b), and show that no genuine issues

## B. Jurisdiction under the Declaratory Judgment Act

■ Emphasizing Rooney's voluntary subscription to the special pay agreements and the additional service obligations they impose, the Army contends that Rooney has divested this Court of jurisdiction over his declaratory judgment action by reasserting his connection to the Army and thus mooting his challenge to the revocation of his discharge. Rooney answers that his explicit reservation of rights should be given force, that the Army could have denied his applications had it objected to his reservation of rights, and that, because the agreements provide for the Army's recoupment of any unearned special pay, they are not inconsistent with this litigation.

There are ample reasons for respecting Rooney's reservation of rights. The Army cannot dispute that Rooney's annotation to the special pay agreement was timely or that the notation fairly informed the Army of his position. *See Commercial Union Ins. Co. v. Roxborough Village Joint Venture,* 944 F.Supp. 827, 838 (D.Colo.1996) (listing timeliness and adequate notice as conditions for the effectiveness of a reservation of rights); *Diamond Serv. Co. v. Utica Mutual Ins. Co.,* 476 A.2d 648, 655–56 (D.C.1984) (emphasizing timely notice as a requirement for an effective reservation of rights under District of Columbia law); *Rhodes v. Chicago Ins.,* 719 F.2d 116, 120 (5th Cir.1983) (same, under Texas law). The Army accepted Rooney's annotated application without objection. Furthermore, given that the additional service obligation incurred under the agreements may be served concurrently with any other required active duty and that the Army may recoup any unearned special incentive pay, it is unclear that Rooney's assent to the agreements did anything more to bind him to the Army than did his decision to report for duty on September 30, 2002. Surely the Army would have objected had Rooney disobeyed this Court's order and failed to report for active duty. It cannot now use his compliance to foreclose judicial review of the underlying controversy in this case—a controversy that remains present and live because of Rooney's continued personal interest in a resolution of his military status. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 68 n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Schering Corp.,* 995 F.2d at 1106. The effects of the Army's challenged action have thus been "felt in a concrete way by the challenging part[y]," *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and present a ripe controversy under Article III. *See Reno v. Catholic Soc. Servs.,* 509 U.S. 43, 56–58, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993).

■ More forceful is the Army's contention that prudential factors weigh against the exercise of the Court's jurisdiction to issue a declaratory judgment in this case. A long line of precedent emphasizes that "[j]udges are not given the task of running the Army .... Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not

---

of material fact preclude summary judgment on all the elements of fraud. But as this Court has already held—and as the parties have repeatedly agreed—the controlling provision of law in this case is 1–10b(2). And "under that regulation, the Army need not conclude, before revoking a discharge, that there is clear and convincing evidence of fraud, *contra* Fed.R.Civ.P. 9(b), but only that there is some evidence that the discharge was obtained under fraudulent circumstances." Mem. Op. of Sept. 12, 2002, at 8. The Court's prior rulings with regard to the appropriate standard are the law of the case. *See Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735, 739 (D.C.Cir.1995).

to intervene in judicial matters." *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1511 (D.C.Cir.1989) (quoting *Orloff v. Willough-by*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953)); *see Rostker v. Goldberg*, 453 U.S. 57, 64–65, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) ("perhaps in no other area [than military affairs] has the Court accorded Congress greater deference."); *Brown v. Glines*, 444 U.S. 348, 360, 100 S.Ct. 594, 62 L.Ed.2d 540 ("the special character of the military requires civilian authorities to accord military commanders some flexibility in dealing with matters that affect internal discipline and morale"); *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) ("[I]t is difficult to conceive of an area of governmental activity in which the Courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.") (emphasis original). The Army likens fraudulent separation to desertion, "a crime which strikes at the very core of the armed force," and thus a fitting issue on which to defer to the judgment of military authorities. *See United States v. Cole*, 24 M.J. 18, 23 (CMA 1987). Rooney answers that his allegedly fraudulent separation is not an intrinsically military concern; rather, the question it raises is whether he is a soldier or a civilian, and thus, whether he is subject to military jurisdiction at all. *See United States ex rel. Roberson v. Keating*, 121 F.Supp. 477, 479 (N.D.Ill.1949) ("when we come to the question of whether or not a citizen is or is not a member of the [armed forces], the point becomes basic and fundamental under our constitution and must be judged by the civil courts").

For the reasons elaborated in Part II. C., *infra*, the Court is ultimately persuaded that the Army has the better of this argument. Here, it suffices to note that there is a clear military interest in preventing the attrition of its obligated force through fraudulent separation. That interest is substantial enough to inform the Court's consideration of whether to exercise its jurisdiction under the DJA and issue the declaratory judgment that Rooney requests.

Several factors typically weighed by courts in deciding whether to exercise jurisdiction under the DJA are inconclusive in this case. *See Hanes Corp.*, 531 F.2d at 591 n. 4. While declaratory judgment for Rooney would likely settle the controversy between the parties, for instance, it is clear that Rooney did not avail himself of intraservice remedies before invoking the jurisdiction of this Court.[14] There is a high degree of adverseness between the parties, but Rooney's conduct as captured in the record does not strike the Court as so notably equitable as to compel a declaration of his rights.

But one overriding concern supports the consideration of Rooney's action for declaratory judgment: it would be incongruous for this court to refuse to exercise its jurisdiction over Rooney's claim after already having twice intervened to address the rights of the parties in this

14. Rooney notes that resort to the Army Board for the Correction of Military Records is, strictly speaking, permissive. He is not absolutely required to exhaust Army administrative remedies before suing in federal court. *See Darby v. Cisneros*, 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). However, this Court may properly consider his failure to exhaust even elective administrative remedies in determining whether to grant declaratory relief. *See Sturm, Ruger & Co., Inc. v. Occupational Safety and Health Admin.*, 186 F.3d 63, 64–65 (1st Cir.1999).

case without the Army objecting along these lines. "In deciding whether to exercise its jurisdiction under the Declaratory Judgment Act, it is worthwhile for the Court to examine the path it would have to take in assessing the merits" of the declaratory judgment plaintiff's claims. *Flynt v. Rumsfeld,* 245 F.Supp.2d 94, 108 (D.D.C. 2003). Having tread so far into the merits of Rooney's claims on prior occasions, there would be little judicial economy in declining to analyze what is, at last, a fairly complete record of the facts and circumstances surrounding the Army's revocation of Rooney's discharge. In reaching this conclusion, the Court does not chip away at the wall between judicial and military authority. The Court does not hold that every soldier whose discharge is revoked is entitled to review of the revocation in federal court. But where, as here, the revocation of an allegedly fraudulent separation presents a ripe controversy between a soldier and the Army and an ample record exists, a court may in its discretion entertain a declaratory judgment action by the soldier to consider the validity of the revocation of his discharge.

## C. The Discharge Revocation

Having reached the merits of Rooney's action for declaratory judgment, however, it is apparent that neither his construction of 1–10b(2) and § 803(b) nor his due process challenge warrant judgment in his favor. While the plain language of 1–10b(2) and § 803(b) does not amount to an express Congressional endorsement of administrative discharge revocation, *see Chevron* 467 U.S. at 843, 104 S.Ct. 2778, the Court finds the Army's interpretation to be a "permissible construction of the statute" and regulation. *Id.*

15. *See* pp. 11 and 14 n. 12, *supra.*

### 1. *Administrative Revocation*

■ "We begin, as always, with the plain language of the statute in question." *Citizens Coal Council v. Norton,* 330 F.3d 478, 482 (D.C.Cir.2003).[15] On its face, 1–10b(2) does not speak to the precise question at issue in this case—namely, whether a judicial determination of fraud is required before a soldier's discharge may be revoked. But it states that "[a] discharge order may not be revoked after its effective date provided ... there is no evidence that the discharge was obtained under fraudulent circumstances." Army Regulation 135–175 § 1–10b. Hence, it infers that a discharge order may be revoked where fraud is involved, and certainly the Army is correct that the plain language of 1–10b(2) does not prohibit a discharge revocation like the one in this case. Turning to § 803(b), the Army is again correct that it, too, is devoid of any language prohibiting the administrative revocation of a fraudulently obtained discharge: "[t]he statute is permissive, not prohibitive, in nature. It confers specific *in personam* criminal court-martial jurisdiction over a specific class of individuals." D.'s Rep. to Pl.'s Opp. at 16. Thus understood, § 803(b)'s primary purpose is to extend court martial jurisdiction over a small class of purported civilians—those who have by fraud obtained a voidable discharge from the armed forces. But it does not speak to whether such individuals can have their fraudulently obtained discharges revoked administratively, as 1–10b(2) seems to contemplate.

Rooney contends that the Army cannot revoke a discharge order under 1–10b(2) without first obtaining a judicial determination—by a court martial or otherwise—that the discharge was fraudulently obtained. Although he cannot deny that, as

a matter of logic, the plain language of 1–10b(2) and § 803(b) does not foreclose the revocation of a discharge without a judicial determination of fraud, Rooney argues that such a construction would read § 803(b)'s invocation of court martial jurisdiction out of meaningful existence. Pl.'s Cr. Mot. at 44–45. Stated differently, Rooney's objection to the Army's construction is essentially this: if the Army can unilaterally revoke a discharge simply on the basis of an administrative finding that the discharge was obtained under fraudulent circumstances, then the Army will never have cause to convene a court martial to make a judicial determination of fraud as contemplated by § 803(b). Thus, Rooney contends that a discharge allegedly obtained by fraud is not void at the moment that it is issued; instead, it is voidable upon a judicial determination that it was obtained under fraudulent pretenses. *See* Pl.'s Cr. Mot. at 34–35. Ultimately, Rooney's position fails because it erroneously construes a discharge revocation as a punitive measure in and of itself; it also rests on a misconstruction of the relevant case law.

In support of his position, Rooney cites several cases also relied upon by the Army. In *Wickham v. Hall,* 12 M.J. 145 (C.M.A.1981), a soldier whose discharge had been administratively revoked sought to prohibit her subsequent trial by court martial on a charge that she had fraudulently procured her separation from the Army. The Court found her amenable to trial by court martial, and held that § 803(b) constitutionally extended military jurisdiction to persons whom the government had charged with having fraudulently obtained their discharges. *Id.* at 149–50.

As the Army has stressed in this case, the *Wickham* court explained that, to remove a soldier from military jurisdiction, a separation

> must of course be due and legal, not fraudulent .... Separation procured by fraudulent means is not a valid separation. The fraud is not expunged by the issuance of a writing certifying the separation; rather, the fraud taints the writing. The taint inheres in the act and the document .... The service member may merge with the civilian populace, but the fraudulent character of his separation exists and it binds him to the military community.

*Id.* at 150 (internal citations omitted). The *Wickham* court went on to consider the soldier's implied due process challenge to the Army's pre-court-martial administrative revocation of her discharge order, which, as here, had occurred without a hearing. The court noted that several cases had upheld unilateral administrative revocations of discharges from active duty, "prior to judicial determination of the legality of the separation and its legal consequences." *Id.* at 152 (citing *United States v. Brown,* 31 C.M.R. 279, 1962 WL 4412 (1962); *United States v. Scott,* 29 C.M.R. 462, 1960 WL 4532 (1960)). Hence, *Wickham* would seem to contemplate administrative revocation of fraudulent discharges. Rooney, however, highlights the ultimate availability of military judicial proceedings apparently presumed by the *Wickham* court. But the court expressly reserved questions about the necessity and character of a hearing because the soldier in that case was not in military custody.[16] *Id.* at 153.

---

**16.** In subsequent proceedings, Wickham challenged the constitutionality of § 803(b) in the federal courts. The Fifth Circuit ultimately found the statute to withstand constitutional scrutiny and affirmed a district court's summary judgment in favor of the Army. *See Wickham v. Hall,* 706 F.2d 713 (5th Cir.1983).

Rooney and the Army both also rely on dicta from *Huang v. Sec'y of the Army*, 23 F.Supp.2d 1377 (N.D.Ga.1998). Like this case, *Huang* involved a physician discharged from the Army whose discharge was later revoked. But unlike this case, the plaintiff in *Huang*, an ROTC participant, received no financial assistance from the military as an ROTC participant during his undergraduate and medical school careers. *Id.* at 1378. Additionally, the plaintiff in *Huang* received his discharge simply as the result of an administrative error on the part of the Army, without "any admixture" of fraud or any attempt to solicit a discharge on his part. *Id.* at 1380–81. Under those facts, *Huang* held (1) that the Army may not revoke a validly issued and delivered discharge solely on the grounds of "obvious error," *see United States v. Banner*, 22 C.M.R. 510, 1956 WL 4820 (ABR 1956), and (2) in a case "untainted by any fraud or deception on the part of [a] discharged reserve officer," § 803(b) does not require an exhaustion of military remedies before filing suit in an Article III court. *See id.* Again, Rooney relies on this case for the proposition that a discharge may not be revoked on the basis of fraud without some form of judicial review. The Army stresses, however, that any aid Rooney may find in *Huang* is mitigated by the total absence of fraud in that case. The court agrees with the Army that *Huang* is of little utility here because it did not involve fraud and hence the application of 1–10b(2).

Similarly, the parties draw differing conclusions from *United States v. Reid*, 46 M.J. 236 (1997). That case distills from § 803(b) a two-step process for dealing with fraudulently obtained discharges:

> If the government seeks to court-martial a discharged servicemember on an allegation of having obtained that discharge fraudulently, it can do so. Then, 'upon conviction of that charge,' the Government may subject that servicemember to court-martial for any offense committed before the fraudulent discharge. In effect, Congress has determined that a fraudulent discharge is voidable, not void, and that a court-martial provides an appropriate forum for adjudicating the matter. 'Upon conviction' of the fraudulent separation, the discharge is no longer valid, thereby continuing court-martial jurisdiction over the person for offenses committed prior to the purported discharge.

*Id.* at 238 (citing *Cole*, 24 M.J. at 22). Rooney sees in the language quoted above the suggestion that a fraudulently obtained discharge is voidable only "upon conviction" of fraudulent separation by a court martial. Certainly the language does not say that. The Army concedes that a court martial "provides an appropriate forum" for considering the status of a discharge and declaring it void because of fraud. But the Army notes that *Reid*—like the other cases Rooney cites and the plain language of 1–10b(2) and § 803(b)—does not foreclose the Army's power unilaterally to revoke a discharge on the basis of fraud where the Army does not seek to charge the discharged soldier with any crimes at a subsequent court martial. In other circumstances, Congress has given officers the right to challenge administrative actions of the Army by demanding a court martial. *See* 10 U.S.C. § 804. Its failure to do so in the case of fraudulently obtained discharges bolsters the Army's reading of the statutes.

Recognizing the Army's administrative ability to revoke fraudulently obtained discharges does not sweep unsuspecting civilians under military jurisdiction. A servicemember still must be convicted of the offense of fraudulent discharge before he or she may be placed in criminal jeopardy for offenses allegedly committed before

the discharge. *Cf. United States ex rel. Toth v. Quarles,* 350 U.S. 11, 19, 76 S.Ct. 1, 100 L.Ed. 8 (1955). But where the Army has evidence that it has been fraudulently induced into discharging a soldier still subject to a service obligation, § 803(b) and 1–10b(2) do not prevent the Army from calling the soldier back to service through an administrative revocation of that discharge. Indeed, 1–10b(2) plainly contemplates that a discharge order may be revoked administratively where there is evidence that it "was obtained under fraudulent circumstances." As we shall see, a soldier so recalled is not without other avenues for disputing his or her military obligation.

The Court concludes, therefore, that the Army's interpretation is consistent with the language and purpose of 1–10b(2), and not inconsistent with § 803(b). In combination, those provisions do not preclude administrative revocation of a discharge "obtained under fraudulent circumstances," as the Army reasonably concluded was the case here.

### 2. Due Process

Having disposed of his statutory objection to the Army's administrative discharge revocation, the Court turns to Rooney's due process argument and finds it similarly unavailing. To make out a procedural due process claim under the Fifth Amendment, Rooney must first establish that the governmental action of which he complains implicates a liberty or property interest. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Once it is established that the Army's decision implicates such an interest, "the question remains what process is due... [D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

It is all but certain that the revocation of Rooney's discharge implicates a liberty interest because the Army's allegation of fraud calls into question his good name, character, and reputation. *See Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Federal Bureau of Investigation,* 781 F.2d 1294, 1300 (7th Cir.1986) (an accusation of a potentially criminal act of dishonesty implicates a constitutionally protected liberty interest); *Doe v. Dep't of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.1985) (a discharge amidst allegations of unprofessionalism implicates a constitutionally protected liberty interest in reputation); *cf. Old Dominion Dairy Products, Inc. v. Sec'y of Defense,* 631 F.2d 953, 960–61 (D.C.Cir.1980) (the government's decision to bar a contractor from virtually all government work implicated a liberty interest). The Army responds that a critical element of a claimed invasion of a reputational interest is lacking in Rooney's case—namely, "the falsity of the government's asserted basis for the ... decision at issue." *Guerra v. Scruggs,* 942 F.2d 270, 278 (4th Cir.1991) (internal citations omitted). In assessing whether a constitutional claim can be asserted, the Court will not resolve any material doubt about any of Rooney's alleged falsehoods against him. Additionally, Rooney may well have a property interest in his discharge sufficient to trigger due process analysis. The Army's suggestion that a soldier cannot have a property right in a fraudulently obtained discharge, D.'s Rep. to Pl.'s Opp. at 25, is circular. Any property right in a discharge so obtained is, like the discharge itself, voidable upon an administrative or judicial finding of fraud. *See United States ex rel. Roberson,* 121 F.Supp. at 479. But it cannot be said that Rooney has no liberty or property interests at stake in this case.

The issue is thus whether the available procedure for administrative revocation of a fraudulently obtained discharge consistent with § 803(b) and 1–10b(2) satisfies the requirements of due process. On this question, the Army reasons by way of analogy: as "no constitutional infirmity arises from the absence of a hearing before the involuntary activation of a reservist," *Keister v. Resor,* 462 F.2d 471, 474 (3rd Cir.1972), so no difficulty is posed by the simple reactivation of a fraudulently discharged soldier. Like the reservist, says the Army, the holder of a fraudulently obtained discharge remains under the jurisdiction of the military. Recalling either soldier to duty involves a "simple, ministerial act" by Army personnel managers. *See* D.'s Mot. Sum. J. at 17. Rooney responds that greater liberty interests are at stake in the revocation of a discharge than in the activation of a reservist; a dischargee's status vis-a-vis the military is more drastically changed when his discharge is revoked than a reservist's status is when he is activated. Furthermore, since "a reservist's status seems to fall in between that of a civilian and that of a solder on active duty ... [the reservist] may be entitled to an intermediate standard of due process." *Mellinger v. Laird,* 339 F.Supp. 434, 443 n. 29 (E.D.Pa.1972). Rooney places great weight on the fact that aggrieved reservists may in some cases receive a hearing before an intraservice Delay Appeal Board, noting that an aggrieved dischargee receives no such procedure under the Army's reading of 1–10b(2). *See id.* at 440.

Although imperfect, the Army's analogy does have some merit. It is not clear that the holder of a fraudulently obtained discharge has a more significant liberty interest than a reservist. Because the holder of a fraudulently obtained discharge has only a voidable status as a civilian, his or her liberty interest may be so attenuated as to require only an *ex parte* administrative consideration—subject, of course, to the soldier's resort to the Army's Board for the Correction of Military Records and ultimately to the writ of habeas corpus.

Perhaps the Army's more forceful analogy is to desertion. That analogy finds support in case law relied upon by both parties:

> A fraud that procures separation from active duty impairs the ability of the service to meet its primary function. Viewed from the standpoint of its practical consequences upon the service member's unit, fraudulent procurement of the member's separation is the functional equivalent of the member's desertion. Both acts directly diminish the unit's readiness and capability to perform its mission.

*Wickham,* 12 M.J. at 151. In dealing with such threats to its readiness and capability to perform its mission, the armed forces have consistently been allowed to dispense with some of the procedural safeguards that apply in civilian life. *See O'Mara v. Zebrowski,* 447 F.2d 1085, 1090 (3rd Cir. 1971) ("[d]eterminations of a rather summary character which substantially affect individuals are ... an everyday occurrence in the military"). A court's primary concern when deciding whether to approve such departures from civilian due process is to ascertain that the military action under consideration conforms to the relevant regulations. *See Antonuk v. United States,* 445 F.2d 592, 595 (6th Cir.1971).

In this case, the Army's decision administratively to revoke Rooney's discharge did not depart from the requirements of 1–10b(2) and § 803(b). The latter of those provisions—which is also the source of the former, *see* Pl.'s Cr. Mot. at 43–44—has consistently withstood direct constitutional scrutiny. *See, e.g., Wickham,* 706 F.2d at

717; *Reid,* 46 M.J. at 238; *Cole,* 24 M.J. at 23. The Court agrees with those assessments of § 803(b) even as construed to permit administrative revocation of a fraudulently obtained discharge. Moreover, the Court is not persuaded that 1–10b(2)'s failure to demand that fraudulently obtained discharges be voided by a court martial renders it constitutionally infirm. For one thing, an aggrieved soldier retains the ability to challenge his or her detention pursuant to an asserted active duty service obligation by petitioning for a writ of habeas corpus in the jurisdiction of his or her military station.[17] *See* 28 U.S.C. § 2241; *Monk v. Sec'y of Navy,* 793 F.2d 364, 368–69 (D.C.Cir.1986); *cf. Wickham,* 706 F.2d at 718. Additionally, a trial upon formal charges may not be an appropriate means for dealing with an improperly issued discharge, because recalling a soldier to his or her duty is not a punitive act. A formal charge and trial would be an inappropriate way to revoke discharges in the other situations contemplated by Army Regulation 135–175 § 1–10b: discharges published from unauthorized headquarters and discharges as to which the officer to be discharged has received neither actual nor constructive notice. The fact that discharges obtained under fraudulent circumstances are grouped with these other forms of voidable discharges—which are obviously amendable to administrative remediation—leads the Court to conclude that Congress did not intend to require a court martial whenever the Army chose simply to revoke a fraudulently obtained discharge.

## D. Adequacy of the Record

The balance of the Court's review of the Army's decision in this case is straightforward: it must determine whether the Army's challenged action is supported by substantial evidence in the record and whether the agency's interpretation is "plainly erroneous or inconsistent with the regulation." *Memorial Hosp./Adair County Health Ctr., Inc. v. Bowen,* 829 F.2d 111, 116–17 (D.C.Cir.1987). The Court may not substitute its own judgment for that of the Army. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Beverly Enterprises, Inc. v. Herman,* 130 F.Supp.2d 1, 13 (D.D.C.2000). The Army is entitled to substantial deference in interpreting its own regulations. *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. And while other constructions may exist, the Army's "need not be the only reasonable one to gain judicial approval." *Connecticut Dept. of Income Maintenance v. Heckler,* 471 U.S. 524, 532, 105 S.Ct. 2210, 85 L.Ed.2d 577 (1985); *Larkin Chase Nursing & Restorative Ctr. v. Shalala,* 2001 WL 34035688, *2 (D.D.C.2001).

Rooney contends that this Court erred when it remanded proceedings to the

---

**17.** Borrowing from *Huang,* Rooney contends that the Army's reading of 1–10b(2) permits an absurd hypothetical situation. "[I]t would permit the Army to, after ordering plaintiff to active duty and requiring him to perform duties as a soldier for a number of years, bring a court martial for fraudulent separation on the day before the five-year statute of limitations expires. At that time, he would be afforded due process and there would be a judicial determination as to the validity of his discharge .... An acquittal would establish that he was actually discharged several years

earlier and that the Army improperly exercised jurisdiction over him for that entire period of time." Pl.'s Cr. Mot. at 50; *see Huang,* 23 F.Supp.2d at 1382. The availability of the writ of habeas corpus is, as the Army notes, the answer to this supposed quandary. *See* D.'s Rep. to Pl.'s Opp. at 23. A soldier with a good faith belief that his military detention is without legal basis and that his service obligation is complete would have no reason to wait for the Army to bring charges of fraudulent separation.

Army, effectively giving the Army a chance to issue a new revocation of Rooney's discharge. Rooney attacks the Court's analogy to the APA in this context, contending that the Army's first revocation of February 15, 2002, supplied a "rational connection between the facts found and the choice made"—namely, to revoke the discharge on the grounds of administrative error—and thus that remand was inappropriate. Noting that administrative error is not a permissible basis for revoking a discharge under Army Regulation 135–175 § 1–10b, Rooney seeks to hold the Army to its "pre-litigation" rationale. The Army may have made a poor decision when it chose to revoke his discharge on grounds of administrative error, says Rooney, but it is not entitled to make a new decision on other grounds for which it may have found support. *See McDonnell Douglas Corp. v. NASA,* 895 F.Supp. 316, 319 (D.D.C.1995) ("if that were the case, administrative law would be a never ending loop from which aggrieved parties would never receive justice").

■ Rooney's argument misses the mark. It is settled law that "if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). Although the February 15 cover letter that accompanied Rooney's discharge revocation was, strictly speaking, a contemporaneous explanation for the Army's action, it provided an inadequate basis upon which

this Court could perform a meaningful review of the Army's action—precisely the review that Rooney sought. On the other hand, the record as it then existed provided support for the Army's position that Rooney's discharge had been procured by fraud and was revoked on that basis. It was for that reason that the Court remanded the matter, and the Army's ample record submitted pursuant to that remand supports its well-explained September 20 decision to revoke Rooney's discharge.

■ It is overwhelmingly clear that the Army relied upon substantial evidence of fraud in revoking Rooney's discharge under 1–10b(2). The record contains uncontroverted evidence that Rooney exploited the bureaucratic complexities of the relationship between AR–PERSCOM and OTSG, withholding key information from both and fostering the false impression that he had no outstanding active duty service obligation. It is an inescapable fact that Rooney, not the Army, was the catalyst for his discharge. Specifically, Colonel Bruce relied on the following facts in concluding that Rooney's discharge was voidable as obtained under fraudulent circumstances: (1) Rooney's failure to inform the Army of what he believed to be service-impairing physical disabilities when he applied for the NGMEP, (2) his decision to withhold material information from the Army when he submitted his request for a modified return-to-active-duty date, (3) his pattern of withholding information from the Army during his participation in the NGMEP, (4) his suspiciously obtained medical evaluations from Drs. Kim and Berkowitz,[18] (5) his use of his VA disability rating to misrepresent his status to AR–PERSCOM personnel, (6) his misrepresen-

18. Even resolving all doubts in Rooney's favor and concluding that these reports were not considered by the VA in evaluating Rooney's disability, the testimony of Drs. Kim and Berkowitz, standing alone, raises "some" evidence of fraud in the events leading to Rooney's discharge.

tation of his obliged status on Form ARPC FL 3937–E, (7) his submission of a letter of resignation despite his undeniable knowledge that he remained subject to an active duty service obligation, which could only mislead Army personnel managers, and (8) his statement on his letter of resignation that at the time of his "recent discharge," he had received a disability rating, which necessarily created the false impression that his discharge was a *fait accompli*. R. 4–15. The record before the decision-maker, and now before this Court, fully supports these factual findings, and formed an adequate basis for an administrative revocation of a discharge under 1–10b(2). In the parlance of the APA, the record provides a rational basis for the Army's decision to revoke Rooney's discharge because it "was obtained under fraudulent circumstances," 1–10(b)(2), and hence that decision is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Nor does Rooney's enumeration of supposed genuine issues of material fact stand in the way of summary judgment for the Army. While it is true that he had completed his five-year statutory service obligation at the time he completed Form ARPC FL 3937–E, it is beyond the pale for him to suggest that he could therefore in good conscience check the box exempting him from the Army's periodic medical examination on the grounds that he had completed his "statutory or contractual obligation." Had Rooney truly understood the Form to have posed an option in the disjunctive, surely he would have been puzzled to find no provision on the Form for those soldiers who, like him, had only contractual obligations to the Army. Rooney's other attempts to impugn the pile of evidence adduced by the Army are woefully inadequate even to raise a colorable issue of fact. In short, the Army's reasonable conclusions and ultimate decision

drawn from that factual record were certainly not arbitrary and capricious.

### CONCLUSION

Upon consideration of the entire record, the Court finds that the Army did not act arbitrarily or capriciously in revoking Rooney's discharge and that its decision to do so was based upon substantial evidence. Moreover, Rooney's statutory or regulatory interpretation and due process arguments are unavailing, particularly in light of the deference in interpreting its regulation that the Army is due under *Chevron*, and the additional deference owed to the Army on a military matter. For these reasons, the Army's motion for summary judgment is hereby GRANTED; Rooney's motion for declaratory judgment is DENIED, and his cross-motion for summary judgment is similarly DENIED. A separate order has been issued on this date.

### ORDER

Upon consideration of defendant's motion for summary judgment, plaintiff's motion for declaratory judgment, plaintiff's motion for summary judgment, and the entire record, and for the reasons stated in the Memorandum Opinion issued on this date, it is hereby

ORDERED that defendant's motion for summary judgment is GRANTED; and it is further

ORDERED that plaintiff's motion for declaratory judgment is DENIED; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED.

Judgement is entered for the Secretary of the Army on all claims.