EFFRON, Chief Judge,
with whom STUCKY, Judge, joins (dissenting):
The Air Force discharged Appellant and did not have authority to revoke his discharge. The eases cited by the majority are informative regarding the factors that may be considered in evaluating jurisdictional issues, but those cases do not resolve the question presented today regarding the relationship between court-martial jurisdiction and the personnel management provisions of 10 U.S.C. § 1168 (2000). Accordingly, I respectfully dissent from the conclusion of the majority opinion that the court-martial had personal jurisdiction in the present case.

Discharge and status

On January 23, 2004, the Air Force Personnel Center ordered the discharge of Airman First Class Dustin Hart by reason of physical disability, effective March 3, 2004. On March 3, 2004, the Air Force discharged Hart, changing his status from military to civilian.
At the time of discharge, the Air Force provided Hart with an official record of the action, DD Form 214 (“Certificate of Release or Discharge from Active Dut/’). Consistent with the direction from the Office of the Secretary of the Air Force, the DD Form 214 documenting the separation described the action as a “discharge” and set forth the reason as “disability.” The DD Form 214 listed the separation date as March 3,2004.
Hart’s discharge severed his connection with the armed forces, and terminated his *278 status as a person subject to the Uniform Code of Military Justice (UCMJ). Following his discharge, Hart did not fall within the categories of persons subject to military jurisdiction based upon their ongoing relationship with the armed forces. See Article 2, UCMJ, 10 U.S.C. § 802 (2000). Likewise, he did not fall within the categories of persons expressly designated by Congress as subject to military justice jurisdiction following discharge. See Article 3, UCMJ, 10 U.S.C. § 803 (2000).

Post-discharge court-martial charges

In the months preceding his discharge, Hart had served as a confidential informant for the Air Force Office of Special Investigations (OSI), gathering information about illegal drug use by other active-duty service-members. OSI had recruited him in January 2004 during an investigation into his illegal drug activity. In the course of this investigation, Hart admitted to various drug offenses, but no charges were preferred against him prior to his discharge. Instead, the Air Force relied on Hart as an undercover informant. At the time of his discharge, OSI planned to utilize Hart’s assistance in an undercover drug operation scheduled for March 6-8, 2004.
After his return to civilian life, Hart notified an OSI agent that he was no longer a member of the Air Force and that he would not engage in further work as an OSI informant. OSI, which had been unaware of the discharge proceedings, informed the base legal office, which in turn informed Hart’s former command. On March 5, 2004, the acting commander requested that the support squadron revoke the discharge action. On March 23, 2004, Hart was returned to military control and the command preferred charges against him for pre-discharge drug offenses. The charges preferred against Hart all involve offenses that constitute violations of generally applicable federal law. See 21 U.S.C. §§ 841, 844 (2000). Although it appears that Hart could have been prosecuted in a federal civilian court on these charges, the record contains no indication that the Air Force referred the allegations for prosecution by civilian authorities.
The Air Force, like the other armed forces, has a procedure for placing an administrative “hold” on servicemembers facing possible courts-martial to preclude discharge prior to the disposition of offenses under investigation. See Rule for Courts-Martial (R.C.M.) 202(c)(1); Dep’t of the Air Force, Instr. 36-3208, Administrative Separation of Airmen para. 1.14 (July 9, 2004). Although the record in the present case reflects discussion of a hold by various officials prior to Hart’s discharge, the military judge did not reach a conclusion as to whether a legally effective hold had been placed on Hart. Accordingly, the present appeal does not involve the question of whether Hart’s discharge was issued contrary to a valid hold, rendering the discharge void or voidable. See, e.g., Smith v. Vanderbush, 47 M.J. 56, 58 (C.A.A.F.1997).

Post-discharge analysis of pay and allowances

In the present case, the command purported to revoke Hart’s discharge, relying on the command’s failure to comply with 10 U.S.C. § 1168(a), which provides that a “member of an armed force may not be discharged or released from active duty until ... his final pay or a substantial part of that pay ... [is] ready for delivery to him.” Section 1168 is a personnel management statute designed to protect servicemembers and their families from the adverse financial consequences of premature separation. See United States v. Keels, 48 M.J. 431, 432 (C.A.A.F.1998). The pertinent legislation originated in World War II as part of the Servicemen’s Readjustment Act of 1944, Pub.L. No. 346, § 104, 58 Stat. 284, 285 (1944). This legislation, commonly known as the “G.I. Bill of Rights,” provided “Federal Government aid for the readjustment in civilian life of returning World War II veterans.” 58 Stat. 284. Among other provisions, the Act offered federal aid to veterans in areas such as education, home ownership, and unemployment insurance. Id. at 287-300. This discharge provision ensured the efficient administration of disability claims and the timely discharge of service-members. See H.R.Rep. No. 78-1418, at 5-6 (1944). Nearly twenty years later, the provision was recodified at 10 U.S.C. § 1168. See *279 Pub.L. No. 87-651, § 106(b), 76 Stat. 506, 508 (1962); S.Rep. No. 87-1876 (1962), as reprinted in 1962 U.S.C.C.A.N. 2456, 2458-59. Section 1168 does not address jurisdiction under the UCMJ; nor does the statute require the government to revoke a discharge when the government subsequently discovers that it has failed to perform its obligation to ensure timely accounting of military pay for a servieemember facing a discharge.

Section 1168 and status

Notwithstanding the language and purpose of § 1168, the majority opinion holds that if the government fails to comply with § 1168, the statute “precludes discharge” of a servicemember. United States v. Hart, 66 M.J. at 277 (C.A.A.F.2008). Under the majority opinion’s interpretation of § 1168, the effective date of separation set forth in a discharge document, such as a DD-214, must be disregarded if personnel in the finance office have overlooked or failed to make sufficient progress in calculating a departing service-member’s pay at the time of separation. Similarly, under the majority opinion’s approach, if military authorities provide a person with a DD-214 and inform that person on the effective date that the individual is no longer on active duty, those actions have no effect on the member’s military status. Despite the effective date provided in the discharge document, the person would remain on active duty until an uncertain future time, the date on which his or her “final pay or a substantial part of that pay” becomes “ready for delivery.”
The majority opinion would eliminate the ability of servicemembers and the government to rely on the certainty provided by the effective date set forth in a discharge document. The effective date of discharge is critical to the termination of a person’s entitlement to pay, allowances, and costly military benefits, such as medical care. In addition, the effective date is critical to a person’s availability to military orders, including deployment. Recipients of a DD-214 who had returned to civilian life could be ordered to active duty on the theory that they had never been “effectively discharged” from the armed forces. Hart, 66 M.J. at 277.

Pay administration and corrective action

Military justice jurisdiction, while important, pales in significance to the other aspects of military life to which the distinction between military and civilian status is crucial. The majority opinion would remove the certainty of an effective date on the DD-214, which has spawned relatively little litigation, and replace it with the necessity of determining on a case-by-case basis the date on which an individual’s pay was “ready for delivery.” This uncertainty is further magnified by the fact that each year, the Defense Finance and Accounting Service (DFAS) must accomplish millions of actions involving basic pay, a complex array of allowances, travel reimbursements, and a host of other unrelated financial transactions. See Defense Finance and Accounting Service, http://www.dfas.mil/about. html (last visited May 7, 2008). Although DFAS undoubtedly endeavors to accomplish these myriad tasks in a timely fashion, there is a significant potential for delays and mistakes, as reflected in the lengthy record of the finance proceedings set forth in the present ease. Under the interpretation of § 1168 set forth in the majority opinion, an administrative deficiency in the computation of a member’s final pay will render the discharge ineffective. Aside from disrupting a member’s transition to civilian life, such an interpretation carries the potential for extensive litigation about military pay and benefits, with the possibility of significant costs to the government.
Section 1168 does not require such a result. If the government fails in its obligation to provide a departing servieemember with an important benefit for transition to civilian life, the error may be remedied by completing the required paperwork and making the requisite payment to the servieemember. If the result is not satisfactory, the member can apply to the Board for Correction of Military Records, see 10 U.S.C. § 1552 (2000), or seek relief before the United States Court of Federal Claims, see 28 U.S.C. § 1491 (2000).
Section 1168 does not contemplate, much less require, that the government inform the individual that the discharge is invalid, that the individual abandon civilian employment *280 and the other attributes of civilian life, or that failure to repair to duty post-haste will constitute a violation of the UCMJ. See United States v. Howard, 20 M.J. 353, 354 (C.M.A.1985) (describing the purpose and effect of § 1168); Hamon v. United States, 10 Cl.Ct. 681, 683 (1986) (noting that the plain language of § 1168 and its legislative history “indicate concern not with actual receipt of discharge documents but rather with facilitating veterans’ return to civilian life”); In re Shattuck, 63 Comp. Gen. 251, 252 (1984) (failure to have a member’s final pay ready for delivery did not invalidate an otherwise proper discharge).

Section 1168 and jurisdiction

To the extent that our Court has cited § 1168 in jurisdictional cases, we have done so where the unsettled state of the record requires consideration of multiple factors in determining whether an individual remained in military status. United States v. King, 27 M.J. 327, 328 (C.M.A.1989), for example, involved a servicemember who requested an early discharge for purposes of reenlistment. At the reenlistment ceremony, King was given a discharge certificate. Id. Upon the suggestion that he was now a civilian, King refused to complete the reenlistment ceremony, retrieved his personal effects, and departed. Id. Our Court had no trouble concluding that an early discharge for purposes of reenlistment does not return a servicemember to civilian status. See id. at 328-29 (citing United States v. Clardy, 13 M.J. 308 (C.M.A. 1982); United States v. Johnson, 6 C.M.A. 320, 20 C.M.R. 36 (1955)). We cited 10 U.S.C. § 1168(a) and the related provisions of 10 U.S.C. § 1169 as “generally requiring” the following steps to accomplish an early discharge: (1) delivery of a valid discharge certificate; (2) a final accounting of pay; and (3) completion of an administrative clearing process. Id. at 329 (observing that there was no evidence of any accounting of pay under the facts of the ease). In noting that the discharge statutes “generally” require three steps, the opinion sought to describe the general practice applicable in most instances, rather than set forth an absolute rule. See id.; see also Merriamr-Webster’s Collegiate Dictionary 485 (10th ed.1998) (defining “generally” to include “usually” and “in disregard of specific instances and with regard to an overall picture”).
The present appeal does not involve any of the past circumstances in which the delivery of a discharge certificate failed to terminate military status, such as fraudulent procurement of a discharge, Wickham v. Hall, 12 M.J. 145,150 (C.M.A.1981); apprehension for fraudulent amendment of discharge orders prior to separation, United States v. King, 42 M.J. 79, 80 (C.A.A.F.1995); continuous military service in the event of a discharge for purposes of reenlistment, King, 27 M.J. at 328; delivery of a discharge certificate before the time of day on which the discharge became effective, United States v. Melanson, 53 M.J. 1, 4 (C.A.A.F.2000); or placement of a legal hold prior to the time of day on which the discharge became effective, United States v. Harmon, 63 M.J. 98, 103 (C.A.A.F. 2006).
Instead, we have a case in which the discharge was ordered at the highest level within the military department, the servicemember cooperated in the separation process with no allegation of fraud on his part, the local command did not place a legal hold on the servicemember, the local command issued a discharge certificate to the servicemember, and the command did not seek to revoke the discharge until several days after the certificate was issued. Under these circumstances, Hart’s military status terminated on the date that the command delivered the discharge certificate to him. See Howard, 20 M.J. at 354 (citing United States v. Scott, 11 C.M.A. 646, 648, 29 C.M.R. 462, 464 (1960); William Winthrop, Military Law and Precedents 548 (2d ed.1920 reprint)). As a result, the military judge erred when he rejected the defense motion to dismiss the charges for lack of personal jurisdiction.